YELLOW MEDICINE COUNTY BANK v. GEORGE COOK and Another.[1]

June 27, 1895.

Nos. 9371—(114).

**Usury—Sufficiency of Evidence.**

> As usury works an absolute forfeiture of the whole debt, under our statute, the proofs on which it rests should be scrutinized, and the rule as to the effect of a fair preponderance of evidence applied, with more strictness than in ordinary civil actions. Such a defense ought not to be sustained upon evidence which is intrinsically improbable, when rebutted by evidence which is inherently reasonable and probable.

**Same.**

> *Held*, applying the above rule, that the verdict in this case was manifestly and palpably against the weight of the evidence, and cannot be allowed to stand.

Appeal by plaintiff from an order of the district court for Yellow Medicine county, Powers, J., denying a motion for a new trial. Reversed.

*E. T. Young, L. H. Schellbach,* and *W. A. Lancaster,* for appellant.

*D. A. McLarty* and *A. J. Volstead,* for respondents.

COLLINS, J.[2]   June 4, 1892, defendants, brothers, carrying on quite a large farm together, executed and delivered their promissory note to plaintiff, an incorporated state bank, due in 6 months, for $3,500, with interest payable in advance.   To secure its payment, and at the same time, defendants executed and delivered a second mortgage upon real estate, their farm, and a chattel mortgage on all of their personal property, including growing crops.   This action was brought to recover possession, or value, in case a delivery could not be had, of a portion of the mortgaged personal property, and the defense was usury.   The defendants had a verdict, and plaintiff appeals from an order denying a new trial.

.   We reverse the order squarely on the ground that the verdict, when we apply the proper rule in this class of cases, was manifestly and palpably against the evidence.   It therefore becomes important

---

[1] Reported in 63 N. W. 1093.          [2] Buck, J., took no part.

for us to go into the facts and circumstances surrounding this transaction, as they appeared on the trial, quite in detail, for we frankly admit that a reversal of this character is quite an uncommon event in this court.　It would not now occur, if we were not abundantly satisfied that a wrong and injustice has been accomplished under the plea and guise of the necessity of a strict enforcement of the laws respecting usury in this state, and that on the evidence an unbiased and impartial jury should have found for the plaintiff.　While this court has steadily upheld these laws to their full intent and purpose, and has performed its part in seeing that they were not evaded or defied by any trick or artifice, and while we have no intention to depart from the well-established rule as to a conflict of testimony in ordinary cases, we do not feel inclined to witness and allow what we regard, on the facts, as a clear perversion of a salutary legislative enactment, and the perpetration through it of a fraud upon those who, more fortunate than their neighbors, perhaps, have money to lend.　From a number of facts and circumstances we feel confident that this is just what was attempted here.

The defendants had borrowed money of another party, giving a mortgage on this same real property, and their indebtedness on this account amounted to $3,138, at the time of the loan here involved. But this debt was not due for six months.　George Cook then applied to Mr. Welcome, president of the plaintiff bank, for a loan sufficient to pay off the mortgage debt not yet due, about $42 due as taxes on the land, the incidental costs and expenses connected with the making of the loan, and, according to the president's testimony, an additional sum, about $130, sufficient to pay one Alke for seed grain already obtained and sown on the farm by the defendants.　George Cook denied that anything was said about paying Alke out of the amount so to be loaned.

Two or more interviews were had in the bank, between George Cook and the president, about the money, in which, the latter testified, the former was told that the rate of interest would be 10 per cent., and no more.　Cook, upon the other hand, testified that nothing whatsoever was said about the rate of interest until the note and mortgages were prepared and signed by both defendants, June 4, when he was told, in the presence of his brother, Henry Cook, the co-defendant, that the interest would be 10 per cent., payable in

advance, and that a bonus of $140 would also be exacted.    Henry
Cook was also positive that he heard the president say June 4, which
was Saturday, that a bonus of $140 would be required for the use
of the money.    He could not remember what rate of interest was
asked, or anything further of the conversation, but his recollection
of the amount of the bonus seemed vivid, for, as he expressed it, "I
had it printed down in my head."    All of these conversations and
negotiations were had behind the counter of the bank, the room
itself being very small, in the presence of, and, according to their
testimony, in the hearing of, the cashier, the teller, and the clerk of
the bank.    These three persons denied that anything was said about
a bonus, or that any money was retained as a bonus, and stated that
it was agreed that the interest should be 10 per cent., payable in
advance.

The president testified that when he inquired of George Cook why
he wished to borrow money for six months to pay off a note not due
until that period of time had expired, he was answered that defend-
ants were tired of paying usurious interest to the party then holding
the other note.    Cook denied having made this statement, but in
no manner did he attempt to explain why, with the money already
secured to his use for six months, without any necessity for so doing,
he should apply to plaintiff for a loan to cover the same period of
time, without an inquiry as to the rate of interest, agree to pay
several dollars in the way of expenses in making out and recording
papers and in an examination of the title, and finally take the money
at the highest legal rate of interest, and in addition submit, without
a word of remonstrance, to an extortion amounting to downright
robbery.

It was undisputed at the trial that the plaintiff paid to the party
holding the other note the sum of $3,141, as principal, interest, and
exchange, that there was paid $42.40 for taxes, and that the expenses
before mentioned were $10.    After deducting the interest, as agreed
on, there was left $131.60 to be accounted for.    On the part of plain-
tiff it was contended that payment for the seed grain was to be made
by plaintiff to Alke, and that Cook was to come with him to the bank
that the payment might be made; that Alke and Cook did come to
the bank together two days later, Monday, June 6; that this balance
was then handed to the latter by the cashier, and nearly all of it

immediately paid over to Alke. According to Cook's version of what transpired in connection with this payment, he had spoken to the president of the bank, when negotiating for the loan, about furnishing him some money, as he might need it, during the summer; that on June 11 he went with Alke to the bank, told the president that he wanted $125 for the purpose of paying for seed grain, and obtained it for six months on his own unsecured note bearing 10 per cent. interest, and without a bonus; that he was handed the full amount by the cashier, and at once settled with Alke, paying him $117.40. That the latter was paid, in the bank, with money just then handed to Cook by the cashier stands admitted, so that the controversy is as to how he received it from the bank,—whether on his own note, as he claims, or as part of the loan, as claimed by the bank.

It seems that the seed grain had been purchased from Alke some weeks before, upon a promise to pay cash for it without delay. A few days before the note and mortgages were prepared, he had called upon defendants at their farm, and was told by them that they were making a loan from plaintiff bank, and would pay him out of the proceeds. He met George Cook a few days afterwards, and they proceeded to the bank together. Cook stepped up to the cashier's window, and was handed money enough to pay Alke and to have a few dollars left. The latter thought Cook received $125, and was also quite certain that Cook had no conversation with the president of the bank before receiving the money. Cook testified that he paid this note for $125 when it matured, but he was unable to produce it, giving as a reason that, although he had demanded it, the bank officials always claimed that they were unable to find it among their papers.

The president, cashier, teller, and clerk of the bank testified, upon the trial, that George Cook did not obtain the money with which to pay Alke upon his note, or in any other way, except as hereinbefore stated, and that he did not execute or deliver his note as claimed, or otherwise; and the bank books of account, kept in the regular course of business at and about the time in question, including the bills receivable or discount register, were present in court at the time of the trial. Of course they were inadmissible in evidence, but parol evidence of their contents, showing the specific manner in which the

loan of $3,500 was disposed of and paid out, was given, and it was also shown that there was no entry of any kind, and never had been, in any of the books kept by the bank, pertaining to the reception, discount, or payment of the $125 note.

It was conclusively shown, we think, that if such a note had been executed, delivered, or paid, there was no record of any character in the books of the bank to indicate it, although anything like order or accuracy in conducting the affairs of such an institution would imperatively require two or more entries to be made. While it is conceded that these facts do not establish with absolute certainty that the note never had an existence, and that the statement in relation to its execution and delivery was false, we are of the opinion, when taken in connection with other circumstances appearing in the case, that they go far towards demonstrating that it never was executed or delivered, and that the testimony of George Cook pertaining to the subject was wholly an untruth.

We, then, have a case in which it appears that badly involved debtors, with no other business than that of farming, sought to borrow a large sum of money without immediate need for its use, and without any object whatever, according to their own testimony, for so doing. The only creditor pressing them was Alke, from whom they had bought seed grain, and, if George Cook's testimony is to be believed, this debt was not mentioned at all when negotiating for the loan. Their only purpose, if we are to rely on his evidence alone, was to substitute this plaintiff as their creditor. They evidently did not regard it of importance to inquire as to what rate of interest would be required by plaintiff, nor was it of consequence that interest might be demanded in advance, and that several dollars expense, wholly unnecessary if they did not change creditors, would have to be paid by them. Nor was it of consequence, evidently, that the note which they wished to pay, not due for six months, was simply secured by a second mortgage on their farm, while the new one which they proposed to give was to be secured by the same real estate, and also by a mortgage upon all of their personal property, including growing crops. We are not inclined to believe that there was not some other object or purpose in making a loan from plaintiff, either the one given by Cook, as stated by Mr. Welcome, or that

money was needed to pay Alke, or both.  Or possibly there was a scheme to defraud the plaintiff in the way we think it has been attempted.

Now, in addition to all that has been said about the absence of any motive or object in making the loan, if George Cook is to be believed, it is also to be noticed that, although he had been previously informed as to the amount of money needed to meet his obligations, as estimated at the bank, nothing was said about a bonus until the hour came when the business was to be closed up.  The bank president then demanded $140 as a bonus, although there was only $131.60 with which to meet the demand, and the defendants acquiesced without a word of inquiry, or of remonstrance, or even of surprise. If this statement was to be given credence we should have to say that it was the most open and bold violation of the usury law which has ever been presented to this court, for in nearly if not quite all of the cases, usurious practices have resulted through some artifice or device,—some scheme for an evasion of the law.  We are in doubt which is the more surprising of the two statements,—that which puts the bank president in this bold position, or the one which makes the defendants the cheerful victims of his alleged greed.  Taking both together, they cast discredit upon the truthfulness of either.

Turning now to the second branch of the case, that which pertains to the payment to Alke, and taking George Cook's version of the transaction, we find him repeatedly importuning the president for the loan of a large sum of money for which he did not have a present necessity, but avoiding all reference to a comparatively small sum past due, and for the payment of which he had been called upon by his creditor, and we find the bank officials examining the title to the offered security, holding the matter under advisement for several days, requiring the payment of taxes, and making no inquiries as to any indebtedness for seed grain, which could be made a first lien on the crop, on which security had been demanded.  We also find that, although the bank officials had acted slowly and cautiously with reference to the proposed security, evidently placing little confidence in the defendants' personal ability or disposition to pay, and had required mortgage security upon everything they had to secure with, in less than 10 days the unsecured note of one of the parties is taken, due in six months, no interest in advance deducted, and the money

furnished with which to pay a debt owing from both,— a note which was to be, and according to Cook's testimony was, afterwards, paid out of the proceeds of the mortgaged grain, as these proceeds came into the bank in the fall of the year.

As against these statements, which in themselves seem extremely improbable, we have the books of the plaintiff, the positive denials of its officers, the fact that Alke had previously been told by the Cooks that he was to be paid out of the proceeds of a loan which they were negotiating with the bank, and his statement that he and Cook went directly to the cashier, and were paid the money without any preliminary conversation with the president.

Taking all the facts and circumstances together, and looking at them in a common-sense, business-like way, we are unable to resist the conviction that, under the evidence, the verdict should not be allowed to stand, and if not set aside we invite and encourage schemes and devices for the avoidance of the payment of honestly incurred obligations, quite as false and fraudulent, and as much to be denounced, as those which have been invented for the purpose of evading the penalties for usurious practices.

We have heretofore held that usury need not be proved beyond a reasonable doubt, and that a fair preponderance of evidence is sufficient; but, as usury works an absolute forfeiture of the entire debt, the proofs on which it rests should be scrutinized, and the rule as to the effect of a fair preponderance applied, with more strictness than in ordinary civil actions. Such a defense ought not to be sustained upon evidence which is intrinsically improbable, when rebutted by positive evidence which is inherently reasonable and probable. Applying this rule to the evidence before us the defense of usury was not made out, and the verdict must be set aside.

Order reversed.