THE FRED G. CLARK COMPANY v. E. C. WARNER COMPANY AND OTHERS.
E. C. WARNER COMPANY v. THE FRED G. CLARK COMPANY.[1]

February 24, 1933.

Nos. 29,097, 29,098.

[1]Reported in 247 N. W. 225.

*Elliott, Coursolle & Kelly,* for appellant.
*Cobb, Hoke, Benson, Krause & Faegre,* for respondents.

WILSON, CHIEF JUSTICE.

The Fred G. Clark Company, a Minnesota corporation, sued E. C. Warner Company, a corporation, E. C. Warner, and Harold L. Warner to cancel, on the ground of usury, six promissory notes given by plaintiff to the E. C. Warner Company, dated and in the amounts as follows:

| | | | |
|---|---|---|---|
| March | 19, | 1928 | $ 5,000 |
| March | 28, | 1928 | 10,000 |
| April | 20, | 1928 | 10,000 |
| April | 24, | 1928 | 4,000 |
| April | 25, | 1928 | 12,000 |
| March | 14, | 1929 | 22,000 |
| | Total | | $63,000 |

Upon this indebtedness $1,000 had been paid. The action also sought to cancel certificate No. 9 for 37 shares of the capital common stock of plaintiff corporation which had been issued to H. L. Warner, and certificate No. 10 for 115 shares of such stock issued to E. C. Warner.

E. C. Warner Company prosecuted another action against the Fred G. Clark Company, the plaintiff in the action above mentioned, to recover the amount due on said notes.

The two actions were consolidated for the purpose of trial. Throughout the trial the Fred G. Clark Company was called the plaintiff, and E. C. Warner Company and the individual defendants were called the defendant. We will follow this. Defendant offered no testimony. It apparently rested on the theory of a failure in plaintiff's proof. The decision was for defendant in both cases, and plaintiff has appealed from an order denying its motions for new trials.

The Fred G. Clark Company, an Ohio corporation, herein referred to as the Cleveland company, dealing extensively throughout the United States in petroleum products, has its principal office at Cleveland, Ohio. In about 1912 it established a branch in Minneapolis. One William E. Smith had been in the employ of the Cleveland company as a salesman for a number of years and became manager of its Minneapolis branch in 1926.

In February, 1927, plaintiff corporation was created. There was an issue of 600 shares of common stock. There was some preferred stock. All stock had a par value of $50 per share. This corporation, the plaintiff, became effective July 1, 1927, at which time the Cleveland company turned over its equipment and assets in the Minneapolis branch to plaintiff. Plaintiff paid therefor in cash or preferred stock, which was subsequently converted into cash, the sum of $64,200. In addition to such assets, the Cleveland company transferred the existing good will and business in this territory, which included Minnesota, North Dakota, South Dakota, Montana, Idaho, and the provinces of Saskatchewan, Alberta, and Manitoba; also all road signs and other advertising matter shipped into or used in said territory prior to April 1, 1927; also all business represented by contracts procured in 1926 for the sale and delivery of oil and oil products to jobbers and dealers in this territory and unfilled after April 1, 1927, representing substantially 1,200,000 gallons; also the exclusive right of handling and marketing *HyVis* motor and lubricating oils in this territory.

Fred G. Clark, the president and principal owner of the Cleveland company, became the president of the plaintiff, and Mr. Smith its vice president and general manager.

The plan was that Smith would ultimately control plaintiff corporation. The Cleveland company owned 49 per cent of the common stock. Smith was to receive 51 per cent of the issued common stock or 306 shares on condition that he do whatever was necessary to finance the new corporation. This was to be done at least in part by sale of preferred stock. Pursuant to such requirement he induced one Frazer to purchase 600 shares of the preferred stock

and to pay therefor $30,000, which was the par value thereof. Smith gave Frazer as a bonus 153 shares of said 306 shares as a part of that transaction, and Frazer agreed to provide credit for the plaintiff by guaranteeing its notes at a certain bank to the extent of $30,000; and by the agreement he was required to devote one-half of his time to the interests of plaintiff, receiving a salary of $250 per month. Frazer, however, reserved the option to withdraw, and in case of such withdrawal the Cleveland company agreed to repurchase the preferred stock and with it Frazer agreed to deliver the 153 shares of common stock. Frazer, Smith, and the Cleveland company signed the contract for this arrangement. Frazer became the treasurer of plaintiff and later its secretary. He devoted the greater part of each working day to the business. He looked after the finances and in a measure took charge of the office, handling the details under the direction of Smith.

In September, 1927, Frazer, for reasons of his own, chose to withdraw, and the Cleveland company was required by the terms of said contract to repurchase the preferred stock; and this was later done, entitling it again to become the owner of said 153 shares of common stock. Frazer's withdrawal threw the burden back to Smith to arrange to finance plaintiff or lose the right to have 51 per cent of the common stock.

Smith then turned to E. C. Warner, a man of financial and business prestige, and solicited him to buy the Frazer stock and to finance plaintiff. Warner listened. He became interested and apparently considered the matter. He had his auditor make an examination of plaintiff's books.

On December 21, 1927, Clark, who lives at Cleveland, appeared in Minneapolis, and he and Smith called at the office of E. C. Warner Company and discussed the subject with Mr. E. C. Warner, the president and principal owner of E. C. Warner Company. Mr. Warner was apparently cordial. He asked these men to see Frazer and ascertain and submit to him the best price at which the Frazer stock could be acquired, and he also suggested that they see the lessor of the premises where plaintiff's plant and office are located

and arrange for an extension of the lease. This was done. There-after and in the afternoon of that day they returned to the office of E. C. Warner Company. Smith was called away, and he testified that he left before anything was then said between Clark and E. C. Warner. No one disputes this. Mr. Clark and Mr. Warner then talked. Mr. Clark only has testified as to the talk then had between them. Our statement here is based upon his testimony, which is undisputed. Mr. Warner then and there told Mr. Clark that he had changed his mind and was not interested in buying the Frazer stock.

Up to this time the plan was to have someone step into Frazer's shoes. Up to this moment no idea or thought of borrowing money from Mr. Warner or his company had been suggested. That theory seems to have come from Mr. Warner. Some arrangement was then made between Clark and Warner at that time and place, and what that arrangement was must here be determined by Clark's sole version thereof, aided by all the circumstances disclosed by the record. Clark testified:

Q. "Did you have any further conversation with him then?
A. "Yes, sir.
Q. "In regard to any other arrangement?
A. "We discussed the probable financial needs of the company. I, knowing that we owed $25,000 to the bank at that time, figured somewhere around $30,000 to $40,000 might see us through. He felt we would need more than that because he thought we ought to discount our bills, thought I might need $70,000. He said that he would finance the company for its financial needs, that he would loan the company as needed to carry on the business under an arrangement whereby he would receive six per cent interest on his money, on all the money loaned; that he was to receive half of the salary that Mr. William E. Smith, then vice president and manager, was receiving, and continue to receive it as long as he was loaning money to the company; that he would require 25½ per cent of the common stock; that he wanted his son Harold Warner to be made a director and treasurer of the company; that there might be a

division of the stock 25 per cent, Harold Warner might take some, he would have to have some to be a director, but I told him that we would divide the stock however he and Mr. Warner designated it, and that was the arrangement."

This testimony was given on the first day of the trial. Clark continued on the stand into the second day of the trial. There were an unusually large number of objections which would seemingly tend to confuse a witness. By too much altercation truth is lost. On redirect examination on the second day Clark was asked to state anything further that was said between him and Mr. Warner at said time, and he answered:

"I will give two additions just in case they didn't appear in the record before. I wasn't sure whether they did or not. First, that before leaving the office of E. C. Warner I told Mr. Warner that I would carry out the instruction. I mean that I would instruct Mr. Smith to carry out the arrangement which we had made that afternoon. The other point which I am not sure of whether it got in the record, was that Mr. Warner said that they would arrange for the financing under the arrangement which I outlined, that he was to get, that they were to get six per cent on their money, they were to get 25½ per cent of the common stock, they were to get one-half the salary that Mr. Smith, then manager, was getting, vice president and manager, and that they would want to be represented on the board probably by Harold Warner, and that he should be elected treasurer.

Mr. Krause: "You mean Harold?

Witness: "Harold Warner, as I remember. He specified that he should be elected treasurer, and on that basis the Warner company would finance us."

The foregoing is a complete record of all testimony as to the talk constituting the agreement upon which the claim of usury is now based.

The balance sheet of plaintiff's account books as of December 31, 1927, is as follows:

"Assets

| | |
|---|---:|
| Cash in Drawer | 20.12 |
| Bank | 685.53 |
| Accounts Receivable | 47,288.94 |
| Notes Receivable | 3,218.20 |
| Inventory of Merchandise | 50,599.17 |
| Plant Equipment | 25,182.00 |
| Office Equipment | 2,092.75 |
| Trucks and Autos | 2,025.00 |
| Advances to Salesmen | 915.50 |
| Prepaid Insurance | 968.71 |
| Prepaid Expenses | 1,957.40 |
| Leasehold Improvement | 2,098.00 |

Total Assets                                                                $137,051.32

### Liabilities and Capital

Liabilities

| | |
|---|---:|
| Notes Payable | 25,000.00 |
| Accounts Payable | 8,405.44 |
| Trade Acceptances Payable | 2,581.11 |
| Fred G. Clark Co., Cleveland | 7,258.00 |
| Fred G. Clark, Special | 8,272.78 |

Total Liabilities                                               $51,517.33

Reserves

| | |
|---|---:|
| Reserve for Bad Debts | 216.19 |
| Reserve for Depreciation | 1,827.58 |
| Suspense Account | 9.34 |

Total Reserves                                               $ 2,053.11

Capital

| | |
|---|---:|
| Capital Stock—preferred | 49,200.00 |
| Capital Stock—common | 30,000.00 |

| | | |
|---|---|---|
| Paid in Surplus | 2,339.67 | |
| Earned Surplus | 1,941.21 | |
| | | |
| Total Capital | | $83,480.88 |
| | | |
| Total Liabilities and Capital | | $137,051.32 |
| Book Value of Common Stock | $34,280.88 | |
| Book Value Per Share (600 Shares) | 57.13" | |

The notes payable, amounting to $25,000 as disclosed by the balance sheet, were at a local bank with Frazer's indorsement thereon.

After Mr. Clark left the office of E. C. Warner Company, wherein he had had such talk with Mr. Warner, he instructed Smith to carry out his arrangement. A few days later Smith and Frazer went to the office of E. C. Warner Company, and they there executed in behalf of the plaintiff two promissory notes as directed by Mr. E. C. Warner. The one was for $20,000 in favor of E. C. Warner Company, and the other for $5,000 in favor of H. L. Warner Company. Mr. E. C. Warner then delivered to the plaintiff a check from E. C. Warner Company for $20,000 and another check from H. L. Warner Company for $5,000. These checks may have been payable to the local bank. In any event, they were used there to pay the $25,000 notes bearing Frazer's indorsement. At the same time and place Smith and Frazer issued two new stock certificates in lieu of that representing the so-called Frazer common stock. One of these new certificates, No. 10, was issued to E. C. Warner for 115 shares, and another, No. 9, to H. L. Warner, his son, for 37 shares. What became of the other one share is not clear. The Cleveland company then bought the preferred stock from Frazer, and he stepped aside. The 152 shares of common stock so received by the Warners was the property of the Cleveland company, though Smith had a contingent claim thereto.

Mr. H. L. Warner was put on plaintiff's board of directors and elected treasurer. Later he was made secretary and treasurer.

On December 21, 1927, Smith's salary was $6,000 per annum. The $3,000 specified by Mr. E. C. Warner was paid as he directed by plaintiff's paying $125 per month to him and a like amount to H. L. Warner. In January, 1929, Smith's salary was raised to $7,500 per year, and the salary of the two Warners was raised so that the total thereof would equal one-half of Smith's new salary, or $1,875 per year for each of the Warners. According to Smith's testimony this increase was at the instance of Mr. E. C. Warner. Salaries to the two Warners were not authorized by plaintiff's board of directors in 1928, but were authorized, according to the minutes, in 1929. The Warners received these salaries up to about October 31, 1929, when these actions were commenced and such salaries were discontinued. Perhaps these actions and the discontinuance of the salaries followed the demand from E. C. Warner Company for the payment of the notes.

It will be noted that to the extent that Mr. Warner individually or otherwise financed plaintiff it was done by the lending of money and not by the indorsement of notes as Frazer had done. It would seem that plaintiff, through the instrumentality of Mr. E. C. Warner, executed at least 12 notes aggregating about $120,000, six of the notes having been paid and the other six being the ones now involved in this litigation. All these notes with the one exception were payable to E. C. Warner Company, and they were all the result of the arrangement made on December 21, 1927. Except as to the one $5,000 note given to H. L. Warner Company, plaintiff received a check for each note from E. C. Warner Company.

On December 9, 1927, Smith wrote the Cleveland company when he was hoping to get Mr. Warner to take Frazer's position with the ownership of stock, etc. saying:

"I believe Mr. Warner would be of considerable assistance in an advisory capacity and if the Corporation [plaintiff] is successful, as I think it will be, I believe he will be of assistance in helping to finance the business. What I want to do and I hope you will agree with me is to have Mr. Warner buy Mr. Frazer's Preferred Stock and his Common Stock."

The record shows that what plaintiff sought in a Warner connection was financing. He was not an oil man. He was apparently recognized as a successful financial man. Plaintiff's only interest in him was financial. Mr. Warner told Smith that under his arrangement with Clark (referring to the talk of December 21) they (he and his son) were to have half as much salary as he (Smith) was drawing while they financed the plaintiff.

The testimony is that Harold L. Warner did not perform services for plaintiff from January 1, 1928, to December 29, 1928; that during that period he came to plaintiff's office six to ten times but performed no service at those times. The testimony is that Mr. E. C. Warner rendered no services for plaintiff in 1928 or 1929 other than lending it money; that he was at the office once during that time for about ten minutes. He then talked about the plant and the advisability of plaintiff's having a new plant. It does appear that Smith, the president and manager of the plaintiff, may have considered Mr. Warner's advice in financial matters desirable. He indicated this in the letter to the Cleveland company as quoted above. Smith signed an income tax report reciting under salaries: "E. C. Warner, advisory, $1,500." This may have been prepared by Mr. Warner's secretary. Mr. Warner discussed with Mr. Smith the impropriety of Smith, and also of one Pomeroy, connected with plaintiff, handling certain individual transactions wherein they personally bought automobiles and traded in oil products in a way that gave them individually the profit between the wholesale price and the retail price. The books of the company apparently indicated the true facts without any concealment, but Mr. Warner criticized it, and possibly rightly so; but the testimony is that when the transaction was fully explained to Mr. Warner and it was explained that these transactions usually resulted in a new customer, he was satisfied. This criticism or advice, if it may be called such, on the part of Mr. Warner is mentioned here to show the kind and extent of the services which defendant's counsel pointed to as indicating that the salary was real. Mr. Warner also on one occasion discussed with Smith his overdraft and the overdraft of Pomeroy.

He also on one occasion criticized Smith for having plaintiff pay a commission for the sale of some of plaintiff's preferred stock on the ground that Smith personally had undertaken that obligation in his agreement to finance the company, and Smith agreed with Mr. Warner and yielded to the advice. He then charged this item of expense to his own account. These different acts on the part of Mr. Warner are here stated for what they are worth as constituting services and their proportional relation to salaries received.

The trial court concluded (1) that plaintiff's proof did not negative every reasonably supposable fact which, if true, would render the transaction lawful; (2) that the agreement for salaries contemplated in the agreement of December 21, 1927, was made in good faith for and in a reasonable amount for personal services actually rendered on the part of E. C. Warner in an advisory capacity and for personal services of H. L. Warner as director and treasurer; (3) that the 152 shares of stock transferred to the Warners were without substantial value; (4) that the agreement was between Smith, the Cleveland company, and the two Warners, and that neither the borrower nor the lender was a party to the transaction in relation to the transfer of the stock as a bonus; (5) that the stock being owned by the Cleveland company—a third party—it was not usury for it to give the stock to the lender as a bonus to lend money to plaintiff.

■ This court has said that "the burden is upon the party asserting usury as the ground of his cause of action or defense to negative by his proof every reasonably 'supposable fact which, if true, would render the transaction lawful.'" Palmer v. First M. T. Co. 179 Minn. 381, 384, 230 N. W. 257, 258; Yellow Medicine County Bank v. Cook, 61 Minn. 452, 63 N. W. 1093. Our conclusion here renders it unnecessary for us to discuss Hawkins v. Kronick C. & L. Co. 157 Minn. 33, 38, 195 N. W. 766, in relation to the degree of proof that constitutes a fair preponderance in a usury case. It will not be helpful for us here to indulge in a metaphysical discussion as to the degree of the proof required to constitute preponderance of evidence in a usury case. The law sometimes sleeps; it never dies.

In this case Mr. Warner said: "He would finance the company for its financial needs, that he would loan the company as needed." He specified six per cent interest on all money lent. He required a salary that meant at least $3,000 annually. Under his terms the so-called salary was advanced to $3,750. The testimony is that this was at his suggestion. He was to continue to receive the salary as long as he was lending money to the plaintiff. He said he would require 25½ per cent of the common stock of plaintiff corporation.

The record is silent as to any mention of what services, if any, were to be rendered for the salary. The only thing mentioned was the lending of money. We must construe the language used. It is simple, and the meaning is clear. Of course any ordinary business transaction is presumed to be lawful, but that presumption cannot overcome the plain meaning of the language adopted for the expression of the elements of the agreement. The very expression as disclosed in this record by its terms precludes the idea that the so-called salary or the 152 shares of stock were given for anything but the lending of money.

The law is that the burden is upon a party asserting usury to negative by his proof any hypothesis reasonably drawn from the evidence which would render the transaction lawful. Clausen v. Salhus, 185 Minn. 403, 241 N. W. 56. In a doubtful case the decision ought to be in favor of innocence. That is the rule always and in all kinds of cases. But where even in a case of this character there is no dispute in the testimony and the evidence shows a direct contract whereby, for a loan of money, the lender exacts a usurious bonus or excessive interest, the intent to evade the law is presumed, and then, only, usury becomes a question of law. Strickland v. First State Bank, 162 Minn. 235, 202 N. W. 727; Drew v. Skeena Lbr. Co. Ltd. 180 Minn. 358, 230 N. W. 819. It is the agreement, and not necessarily its performance, which renders the debt usurious. We must look to the elements of the agreement, as and when made. Prior and subsequent facts and circumstances are important only as they aid in ascertaining such intent. M. Lowenstein & Sons, Inc. v. British-Am. Mfg. Co. (D. C.) 300 F. 853, 862. "If they contract

for forbidden interest, though without moral wrong, not knowing that there is a usury law to violate, they are subject to the penalties of usury." Green v. N. W. Trust Co. 128 Minn. 30, 36, 150 N. W. 229, 231, L. R. A. 1916D, 739; 6 Dunnell, Minn. Dig. (2 ed. & Supp.) § 9964; Rantala v. Haish, 132 Minn. 323, 156 N. W. 666; Lukens v. Hazlett, 37 Minn. 441, 35 N. W. 265. Wrongful intention is presumed against one engaged in an illegal act.

Mr. Warner's subsequent conduct does not reflect an intention at any time of rendering a service in an advisory capacity or otherwise to earn the salary. Nor does the record show a situation where plaintiff would probably agree to pay Mr. Warner $3,000 per year for such services as were actually rendered by him and his son, H. L. Warner. While the record discloses expressions by Smith that he considered Mr. Warner's advice in financial matters helpful, it seems evident that the controlling element with plaintiff was to acquire apparently needed money.

The only supposable facts available to defendant are the ones alleged in the answer and as found by the court, viz. that the salary was in good faith contracted for services reasonably worth the salary, and that the stock was not transferred between borrower and lender.

But the language of the agreement as detailed by Clark will not permit an inference that services were to be rendered commensurate with the salary or otherwise. Upon the record before us there was no room for any hypothesis other than that claimed by plaintiff. Subsequent events show that no substantial services were ever rendered by either of the Warners. What little was done, if it may be termed services, must be regarded as financial, and reasonably contemplated as within the agreement to finance plaintiff. If the services actually rendered may be construed as other than being in a financial capacity, they were trivial and no more than any creditor would gratuitously render his debtor without expectation of additional compensation.

Indeed, not only does the language used negative any other reasonably supposable fact which, if true, would render the transaction

lawful, but all the circumstances in the case tend strongly to the corroboration of plaintiff's construction of the agreement. The claim is made that when Mr. Warner said he would finance the plaintiff we might "suppose" that he was going to do that by indorsement of plaintiff's paper as Frazer had done. This contention is not sound and cannot be sustained. The expression of a thing puts an end to tacit implication. Or, to put it in another way, the express mention of one method as the way in which he would finance plaintiff implies the exclusion of another method. Here the contractual obligation was definite. Plaintiff knew what to expect. According to the record, when Mr. Warner said he would finance plaintiff for its financial needs, he, continuing, said "he would loan the company as needed to carry on the business." This clause made more definite the preceding clause and disclosed how he would finance plaintiff. His method of financing plaintiff was limited to the language used as to the lending of money. He also exacted the salary "as long as he was loaning money to the company," again disclosing to plaintiff the plan by which he intended to finance plaintiff. This was the plan definitely expressed by him and to which plaintiff consented. The talk did not disclose any intention or expectation for the loan of credit, which is sometimes permissible. Philadelphia Warehouse Co. v. Seeman (C. C. A.) 7 F. (2d) 999; Grannis v. Temple, 84 Misc. 415, 146 N. Y. S. 239; Gilbert v. Warren, 56 App. Div. 67 N. Y. S. 978. Nor upon this record is Pivot City Realty Co. v. State S. & T. Co. 88 Ind. App. 222, 162 N. E. 27, applicable. A loan of credit was not in the minds of the parties. There is nothing to indicate that. No one suggested it, and it is not disclosed by the language used. It is important to keep in mind the fact that the agreement was carried out and performed precisely in the manner in which Mr. Warner said he would do it, which is the manner in which we are construing it. Obviously the parties understood it as we do.

Usury must be determined by the agreement and the intent of the parties as of the time when the agreement was made. The matter of indorsement of paper never appeared in any of the transactions.

Where the facts are undisputed the question of usury is one of law. The sole question in usury is whether the lender intended to and would receive more than lawful interest and the borrower agreed to pay such. It is the intent to exact the excessive amount regardless of whether the lender actually knew it was illegal. If the intent is to get more than the legal rate and the agreement gives that, the intent to violate the usury law is implied. Intent to actually get excessive interest is the controlling element. No direct intent to violate the usury law as such is necessary. In other words, will the performance of the agreement as made result in the lender getting more than lawful interest from the borrower? Here the agreement speaks for itself. It reflects in its own plain language the intent of the parties. The lender dictated the terms. They were accepted.

When the language, as here, imports a bonus for the loan of money, there is no room for presumption to the effect that the transaction is legal, for the intent is apparent. In re Mansfield Steel Corp. (D. C.) 30 F. (2d) 832. The construction of the language constituting the contract is upon the record before us a question of law.

We are of the opinion that a finding, in substance to the effect that the evidence is insufficient to negative every reasonably supposable fact which, if true, would render the transaction lawful, is as a matter of law unsupported by the evidence, and that the evidence in the case negatives any hypothesis reasonably drawn from the evidence which would render the transaction lawful. In our opinion the evidence in the present record demands a finding that Warner's agreement, in whatever capacity made, called for and required a loan of money only.

There is no evidence to support the further finding that Mr. Warner agreed to assist in financing the plaintiff to the extent of $25,000 to relieve Frazer of his indorsement liability on the $25,000 owing the bank. Frazer's release was an incident consequent to the agreement, not an element of it.

■ The finding as to the salaries necessarily sounds in the original agreement wherein Mr. Warner never mentioned the word "services" or his work for the so-called salary. There is evidence in the case in the nature of letters and statements from Smith and Clark indicating that they considered Mr. Warner's advice in financial matters desirable. If this may be said by inference or otherwise to be connected with the agreement, as to which we do not determine, the findings should have been limited to advisory capacity in relation to financial affairs, as there is no evidence to support such an unqualified finding. Of course the picture may look different after the defendant has put in its evidence. We speak only from the record before us. On the present record there is not a word in the talk constituting the real contract indicating that the Warners or either of them agreed to do anything for the so-called salary other than to lend money.

This case does not involve such services as were in Hobart v. Michaud, 174 Minn. 474, 219 N. W. 878; or Bowman v. Kohlhase, 170 Minn. 8, 211 N. W. 828. See also M. Lowenstein & Sons, Inc. v. British-Am. Mfg. Co. 300 F. 853. Payment for services in loans usually relates to specific services. Connor v. Minier, 109 Cal. App. (Supp.) 770, 288 P. 23; Ashland Nat. Bank v. Conley, 231 Ky. 844, 22 S. W. (2d) 270. The language of the contract before us is insufficient to support the claim for salaries. Even where the language contemplates an actual salary and the services are of little value and the amount agreed to be paid for them is considerable, the inference to be drawn therefrom usually is that the compensation is to be paid for the use of money rather than services. Douglass v. Boulevard Co. 91 Conn. 601, 100 A. 1067. In the instant case it is to be noted that the "salary" payments were to continue "as long as he was loaning money to the company." Why should the termination of the lending of the money cause the salary to cease if the parties had supposed that services were to be rendered commensurate with the salary? This condition that the one should terminate with the termination of the other shows a rather close relation between the salary and the loan, and this circumstance is

consistent with the language of the agreement. If the plaintiff was in need of Mr. Warner in an advisory capacity, whether financial or otherwise, it would seem that he would be needed just as much whether he was lending the company money or not. In obscure cases what is probable is most to be looked to, or what is the most frequently done. Obvious truths need not be proved.

Indeed, the trial court's memorandum would indicate that the salaries were later paid from time to time by the plaintiff pursuant. to "its subsequent employment of said E. C. Warner in an advisory capacity and the subsequent elections of H. L. Warner as an. officer and director." This theory is not sustained by the evidence. The payment of the salary (divided in the salaries by a division between the two Warners) was an essential element of the original agreement, and nothing was ever subsequently done to create the salaries other than carrying out the original agreement.

■ The trial court made a finding in substance that neither on December 21, 1927, nor any other time did the 152 shares of common stock "have * * * any value whatsoever other than such, if any, uncertain speculative value as might be contingent upon the future success of the business" of plaintiff.

In relation to the value of the 152 shares of the common stock in plaintiff corporation, owned by the Cleveland company, transferred to the Warners, it appears from the record that the book value of these $50 shares on December 31, 1927, which is substantially the time they were transferred, was $57.13 per share.

There had been a new set-up of the books in the early summer and about July 1, 1927, when plaintiff corporation became effective. According to the testimony of an auditor, a certified public accountant, it would appear that the books were put upon a proper basis. Much of real but intangible value was charged out, and the books were made to reflect more conclusively the tangible assets, though it seems that certain items were advanced in value to the extent of some $13,000. The auditor testified that from some angles this change did not deserve approval; but on the other hand, in his judgment, it was justified under the circumstances in this

case. There is no positive or direct evidence that the items were entered at an unreasonable or excessive value, nor does the record show that Mr. Warner's auditor did not learn of this when he made his examination. Both Clark and Smith testified that this stock was worth par at the time it was transferred to the Warners and that if other assets not on the books herein mentioned were considered it was worth much more.

From January 1, 1928, to June 1, 1929, the gross earnings of plaintiff were $29,009.24. The proportionate share therein of this stock was $7,252.31. As late as June 28, 1929, Mr. E. C. Warner put a selling price on the 152 shares of $7,252.31, plus earnings accruing subsequent to June 1, 1929. Several witnesses testified as to the value of the physical assets sustaining the figures on the balance sheet hereinbefore set forth. Such assets were in good condition. The books do not reflect any value of good will or of the contracts herein mentioned. Balance sheets of various dates are in evidence, and nothing is pointed out to destroy the effect of the facts now being stated.

Plaintiff's business has been in process of development since 1912. It had a large and apparently attractive territory, as above indicated. It was equipped to and did compound some of the grades of HyVis in its warehouse in Minneapolis, but was required to comply with the formula therefor. When plaintiff corporation began business about six months prior to its contract with the Warners it had a definitely contracted business calling for the delivery of 1,200,000 gallons of oils and greases. The cost to procure this business may have been as much as 2.6 cents per gallon. This was never reflected by the books, and yet it must be readily recognized as a real asset; and it would seem fair to presume that they had a value beyond the actual profits to be made from these contracts.

Plaintiff also had the exclusive right of handling and marketing HyVis motor and lubricating oils in its territory. This came through its parent corporation, the Cleveland company. The claim that it had a contractual right thereto for 99 years and used the trade-name is not substantially denied; and therefore we have not

found it necessary to attempt to analyze the exact facts resulting from various contracts in evidence, some of which are unsigned and some signed by one party only. The record in relation to the plaintiff's contract with the Cleveland company as to *HyVis* puts an unfair burden upon this court, and whether plaintiff had a technically legal contract we make no effort to determine. It seems clear that the Cleveland company has control of *HyVis*, etc., that it is substantially financially interested in plaintiff; that its success in this territory depends primarily upon plaintiff's success; and that the Warners or no one else prior to this litigation ever claimed such contract did not exist. It is not certain that such claim is now made. The existence of such a contract is important here solely as an incident to the value of the stock. It may have been since changed to a royalty contract. It may be sufficient to say that the Cleveland company owns and controls a certain extensively advertised lubricating oil sold under the registered brand *"HyVis."* It seems that the oil is refined at Warren, Pennsylvania, by the Conewango Refining Company, of which Mr. Clark owns five-sixths of the stock. The success of the Cleveland company and the success of the plaintiff rested largely upon the success of *HyVis*. Mr. Smith gave his opinion that the value of the *HyVis* contract held by plaintiff is from $60,000 to $100,000. Mr. Clark was not permitted to give his opinion as to the value of this contract, and the trial court stated that it was presumed that the contract had some value. It is of vast importance that we recognize the fact that *HyVis* is a nationally advertised product and is given publicity in such mediums as the *Saturday Evening Post, Colliers, Liberty, Literary Digest,* and perhaps other nationally recognized advertising mediums. It would seem also from the record that the Cleveland company pays toward national advertising at least two cents per gallon on the total sales of *HyVis* oils and greases in the United States and Canada. It necessarily follows that plaintiff has some contractual rights in relation to its *HyVis* contract as a valuable asset. Several witnesses put the value of the good will of plaintiff corporation in December, 1927, at $50,000. It is also

to be noted that there had been spent in plaintiff's territory $9,000 for road signs. This item, good will, *HyVis* contract, and the 1926 contracts for sale of products, were not included in plaintiff's books as assets in making up the book value of its stock.

We have stated in some detail the testimony, circumstances, and evidence bearing upon the value of this stock at the time of the making of the agreement. We will add briefly that plaintiff was a going concern in a modern business with opportunities before it. The value was not wholly uncertain. The evidence reasonably required a finding of a substantial value. Under the usual rules of determining value it would seem that the evidence requires a finding that this stock at the time involved was then reasonably worth at least substantially par. Some correspondence in evidence discloses Mr. Warner's confidence in the integrity of plaintiff and belief in the value of its stock. Nor would he otherwise have been likely to lend such a large amount of money to plaintiff without security. He definitely placed a sale value on the 152 shares within a few months after he got them in excess of par. Our statement of the fact covers the elements reflecting the character of this stock satisfactorily indicating, we believe, a substantial value. Of course the permanency of values usually depends upon an unknown future. The evidence as to the value of this stock is by no means limited to its speculative value contingent upon the future success of the business, which phrase might, with some degree of propriety, be applied to the value of any corporate stock in a going concern. Plaintiff's testimony as to value is in no way contradicted, and there is nothing worthy to be called impeachment evidence as to any of the witnesses other than Smith; and as to him the impeachment is slight and the corroboration is great. We are of the opinion that the evidence in this case compels a finding that at the time in question this particular stock was reasonably worth at least par.

■ E. C. Warner Company was the lender. Plaintiff was the borrower. The stock which was transferred to the Warners was owned by the Cleveland company. The trial court concluded that the stock was a bonus given independently by a third party to in-

duce the making of a loan to plaintiff and therefore did not constitute usury. We think the facts in this case do not invoke the application of the rule involved in such theory.

The court finds that such contract as was made was made between Smith, the Cleveland company, E. C. Warner, and H. L. Warner. He thereby eliminates plaintiff from being a party to the contract. He includes Smith and H. L. Warner as parties thereto, though neither was present when Clark and Warner came together upon the terms of the agreement. As far as the record is concerned, neither Smith nor H. L. Warner ever knew of any thought or discussion relative to a loan until after Mr. Clark and Mr. Warner talked on December 21, as hereinbefore mentioned. After the agreement was reached between Clark and Warner the former directed Smith to conclude the arrangement which he had made with Mr. Warner. Smith, with the assistance of Frazer, the then secretary of plaintiff, did so. But nowhere in the transaction did Smith have any part in the making of the agreement, nor did he in any way participate therein. Certainly there is not a scintilla of evidence showing H. L. Warner to have had any contact with the making of the agreement. He was not a beneficiary thereunder by virtue of the terms of the agreement, but was such subject to the pleasure of his father. Mr. H. L. Warner later became officially connected with plaintiff, but he did not participate in the making of the agreement; nor did Smith. The evidence can hardly be said to sustain the finding as made.

We are not able to determine by the record how the court reached the conclusion that the Cleveland company and not the plaintiff was a party to the agreement. Clark was the president of plaintiff. It was plaintiff that was in financial distress, not the Cleveland company. Clark did not come to Minneapolis for the December 21, 1927, negotiations with Warner at the instance of the Cleveland company. He came at the instance of Smith. That trip was the culmination of negotiations which Smith had carried on with Warner relative to Warner's buying stock in plaintiff corporation. When Mr. Clark reached Minneapolis on December 21, he and Smith

called on Mr. Warner, and they discussed the affairs of plaintiff, of which Clark was president. There was no talk or discussion about the affairs of the Cleveland company. It was not then directly interested in Mr. Warner. True, Mr. Clark stood in a dual capacity as president of both companies; but it seems that since he joined Smith, who up to that time had sought Warner's connection through the purchase of the Frazer stock, Clark was there to help Smith, who also was acting both for the plaintiff and for himself. That project was directly in the interest of plaintiff. It is plain that Smith was representing plaintiff when he said this:

"I, knowing that we owed $25,000 to the bank at that time, figured somewhere around $30,000 to $40,000 might see us through  *  *  * he thought  *  *  *  I might need $70,000."

The Cleveland company was indirectly interested. It was a stockholder in plaintiff corporation, and it wanted plaintiff to succeed in selling HyVis, etc., not only because it was such stockholder but because plaintiff was selling its product. We find no evidence to indicate that Clark was representing the Cleveland company on this particular occasion and not representing the plaintiff.

But Mr. Warner, in whatever capacity, made a contract with plaintiff; that is, he closed with plaintiff. He lent the money to plaintiff. He took plaintiff's notes. He later got his salary checks from plaintiff. It was to plaintiff's officers that he gave whatever financial help and advice he rendered. Who represented plaintiff in making this contract for its performance, and which it in fact did perform for about two years? Somebody must have. Obviously it was Clark. He must then have been acting as its president when he and Mr. Warner agreed upon the terms which were later carried out by plaintiff. Clark is the man who gave directions to Smith to carry out the arrangement that he, Clark, had made with Warner. In what capacity did he then act? As plaintiff's president, of course. It would seem to follow that he must also have acted in that capacity when he talked with Warner. Clark as president of the Cleveland company was present. As such he had full knowledge of the agreement. He knowingly turned into the

transaction the 152 shares of common stock which his Cleveland company then owned. We think, however, that the evidence does not sustain the finding that the Cleveland company was a party to the contract to the exclusion of plaintiff's being a party thereto.

■ Who then was on the other end of this transaction? Was it E. C. Warner individually? Mr. Warner is the president and principal owner of E. C. Warner Company. The record indicates that in practical operation he is the company and the company is he. The company's name is on the office door. The E. C. Warner Company was the payee in all of the notes given under the arrangement herein mentioned, with one exception, which was made to H. L. Warner Company. All money lent to plaintiff, with the one exception of $5,000, came to plaintiff by checks from the E. C. Warner Company. As hereinbefore stated, Warner agreed to lend money. If this was a personal undertaking, why did he not personally lend the money? The company did. That is evidence that its president's agreement was its agreement. The company was engaged in the investment business. Clark testified that Mr. Warner "specified that he [Harold] should be elected treasurer, and on that basis the Warner Company would finance us." This stands undenied. What is the motive here for a distinction between Warner and his company? There was no necessity for any such distinction until it became important to show that Mr. Warner was in a position legally to do what he could not have done otherwise.

In a letter in December, 1928, Mr. Warner wrote in reference to money plaintiff had borrowed and said:

"They can reduce the amount they owe me," etc. and "I will allow it to run along * * * I may be disposed to make some temporary additional advances."

The indebtedness to which he then referred ran to E. C. Warner Company, not to Mr. Warner. On January 4, 1929, he wrote for a reduction of "your indebtedness to the undersigned," and the undersigned was E. C. Warner. On August 5, 1929, Mr. Warner wrote suggesting that plaintiff give a note to the Cleveland company "for the amount due the undersigned," and the undersigned was E. C.

Warner. But the money to which he refers was due the E. C. Warner Company, not E. C. Warner.

True, Clark testified that Mr. Warner said he would finance plaintiff, that he would lend the plaintiff money as needed. Clark told Smith to carry out the arrangement with Mr. Warner. The correspondence between Smith and Clark referred to Warner and not the company. Obviously no one made any distinction between Warner and his company. He did not himself. Apparently no one had any occasion to consider this element. Necessity therefor did not develop until this action was commenced.

Mr. E. C. Warner was the sole representative of E. C. Warner Company in authorizing and making its loan to plaintiff. He consulted no one. He was the only one in control. Apparently he substantially owned the company. His knowledge in the transaction was his company's knowledge. When an officer who is intrusted with the management of the business of the corporation exacts or receives a bonus of any kind for a loan made by the company through him, it is presumed to be the act of the company. It calls for explanation. Lewis v. Willoughby, 43 Minn. 307, 45 N. W. 439; Stein v. Swensen, 44 Minn. 218, 46 N. W. 360; 6 Dunnell, Minn. Dig. (2 ed. & Supp.) § 9968; Freedman v. Katz, 246 Mich. 296, 224 N. W. 325. Here the explanation has not been given.

■ If a bonus is paid to a lender by a third person for his own reason without knowledge of the borrower, the transaction will not be usurious. 3 Williston, Contracts, § 1693; 2 Page, Contracts, § 967; Tucker v. Fouts, 73 Fla. 1215, 76 So. 130, L. R. A. 1917F, 916; Madison University v. White, 25 Hun, 490; Clarke v. Sheehan, 47 N. Y. 188; Widell v. National Citizens Bank, 104 Minn. 510, 116 N. W. 919.

In the Widell case, 104 Minn. 510, 116 N. W. 919, 921, Mr. Widell was the president of Widell-Finley Company. He and his wife borrowed $25,000 from one Hoerr. It was held that Hoerr had exacted that Widell get him a $5,000 note from Widell-Finley Company as a bonus, and the transaction was held usurious. The claim was made by Mr. Hoerr that since the corporation, a third

person, was paying the bonus, it was not usurious. This court in rejecting this claim stated [104 Minn. 515]:

"It is quite clear that neither the rule nor any of the cases cited has any application to the facts of this case, for the corporation was not a volunteer in giving the note for $5,000, but, on the contrary, the borrower, Widell, was required to secure the agreement and note from the corporation, and it was at his request and by his procurement that they were made, and, the note having been given at his request, he was required to account with the corporation for the amount thereof. It follows that the corporation was not a volunteer, and that the consideration for its promises moved from the borrower and not from the lender. The cases cited illustrate the distinction between the cases which are within the rule stated and the one at bar."

This language is peculiarly applicable to the instant case. Clark, president of plaintiff, was also president of the Cleveland company. He had full knowledge of all the facts. His knowledge was plaintiff's knowledge. Plaintiff therefore knew that the bonus was being given by a transfer of the stock. The transfer was authorized by Clark. He gave away the stock owned by the Cleveland company, of which he was president. His knowledge was its knowledge. He would be required as a matter of law, as Widell was, to account to his corporation for the value of the stock. Hence the Cleveland company was not a volunteer. We consider the Widell case controlling, and the claim of usury cannot be met by the claim that a third person was voluntarily paying the bonus without the borrower's knowledge. See also Carozza v. Federal F. & C. Co. 149 Md. 223, 131 A. 332, 43 A. L. R. 1, 2; Rospigliosi v. Glenallen Min. Co. 69 Utah, 41, 252 P. 276.

It would seem from the talk on December 21 that it was the understanding that not over $70,000 would be lent under the arrangement then made at any one time. Within just a few days thereafter Mr. Warner wrote a letter, wherein in referring to the arrangement he said that he would lend money to plaintiff up to $70,000. Clearly it was the intention that money would be lent from time to

time. This was done. The authority and conditions therefor all rested in the talk of December 21. All loans, including the notes now in question, were made under the original agreement as a continuing plan binding upon the parties during the period in which loans were made; and the record is such as to indicate that if any one of the several notes involved was usurious, all were, and if so the notes here involved are.

Reversed and a new trial is granted in each case.

STONE, JUSTICE (concurring).

I concur, but apropos some of the argument I desire to add the following. If in respect to the burden of proof of usury there is apparent conflict between Hawkins v. Kronick C. & L. Co. 157 Minn. 33, 195 N. W. 766, and Palmer v. First M. T. Co. 179 Minn. 381, 230 N. W. 257, 258, the fault is mine, for I happen to have written in both cases. There is no conflict in fact. In the Palmer case [179 Minn. 384] it was said that "the burden of proof is upon the party claiming usury to negative every reasonably supposable fact which if true would render the transaction lawful." That language, used in deciding a civil rather than a criminal case, did not mean that the negative referred to must be established beyond reasonable doubt. No cause of action can be established without proof of every essential element. In a usury case that means negation of all facts which would make the transaction lawful. In any civil case that may be done by a fair preponderance of the evidence, subject to strict scrutiny of the evidence of usury required by the severe penalty involved. Temple v. Davis, 115 Minn. 328, 331, 132 N. W. 257.