ELLEN M. GRAY, ADMINISTRATRIX OF THE ESTATE OF FRANK L. WELCH, DECEASED v. KANSAS CITY MISSOURI, A MUNICIPAL CORPORATION. —194 S. W. (2d) 207.

Kansas City Court of Appeals. April 22, 1946.

*William E. Kemp* and *John J. Cosgrove* for appellant.

676

*John B. Pew* and *Burroughs N. Mosman* for respondent-appellant Frank L. Welch.

BLAND, P. J.—This is an action brought by Frank L. Welch, now deceased, doing business as Frank L. Welch Plumbing Company, for labor and material furnished the defendant, Kansas City, at various times during the years 1938 and 1939. The petition asked judgment in the sum of $6420.05. The case was tried before the court without the aid of a jury, resulting in a judgment in favor of the plaintiff below in the sum of $5682.18. Both parties have appealed.

During the pendency of the appeal plaintiff died, his widow was appointed administratrix of his estate and the cause was revived in her name. Prior to the submission of the case she, likewise, died, and the case has been revived in the name of Ellen M. Gray, Administratrix d.b.n.c.t.a., of the estate of Frank L. Welch, deceased.

Kansas City (hereinafter referred to as the City), assigns errors in reference to the allowance, by the trial court, of a great number of the items covering the labor and material furnished amounting, in all to the sum of $4575.10. The court disallowed certain items and plaintiff appealed, alleging error in connection with the court's action in regard to the same. The two appeals have been consolidated in this court as one case.

At the conclusion of the evidence the City offered a finding of facts and declaration of law, which the court refused. The City insists that the court erred in its action in this respect. The requested finding

and declaration amount to a demurrer to the evidence, and the City now insists that there is no evidence to support the findings of the trial court. Plaintiff insists that the City, having requested a finding of facts, now is in no position to complain that there are not sufficient facts upon which the court could make a finding.

This case is briefed in this court, by both sides, on the theory that the old practise in this court applies relative to cases heard before a trial court without the aid of a jury. However, under the new code, which applies to the procedure in this court after January 1, 1945: [See Anson v. Tietze, 190 S. W. (2d) 193; Klebba v. Otto, 187 S. W. (2d) 499, 500, 501.] "The appellate court shall review the case upon both the law and the evidence as in the suits of an equitable nature. The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses". [Laws 1943, p. 388.] Consequently, this proceeding is to be reviewed by us as are suits in equity. In such suits we arrive at our own conclusions as to the law and the evidence, and the findings, if any, of the trial court are not binding upon us, although they should be given due deference. [St. Louis Union Trust Co. v. Busch, 145 S. W. (2d) 426; Miller v. Farmers Exchange Bank, 107 S. W. (2d) 852; Summers v. Bond-Chadwell Co. et al., 145 S. W. (2d) 7, 12; Phillips v. Alford et al., 90 S. W. (2d) 1060; St. ex rel. Northwestern Mut. Life Ins. Co. v. Bland, 189 S. W. (2d) 542; A. A. Electric Machinery Co. v. Block, (#20635) decided by this court, but not yet reported.] The point made by plaintiff is ruled against her.

The sole contention of the City, is that there is no evidence upon which to base the judgment rendered in favor of the plaintiff below to the extent of $4575.10. It is admitted that no written contract was entered into for the labor and materials furnished the City. However, there is no contention made by the City that the labor and materials were not furnished, or, that the charges made therefor are not reasonable.

Section 3349 Revised Statutes Missouri 1939, provides: "No county, city, town, village, school township, school district or other municipal corporation shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless such contract be made upon a consideration wholly to be performed or executed subsequent to the making of the contract; and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing."

Section 92 of the City Charter (Revision of 1928) reads, in part, as follows: ". . . No contract or order imposing any financial obligation on the city shall be binding upon the city unless it be in writing and unless there is a balance otherwise unencumbered to the credit

of the appropriation to which the same is to be charged, and a cash balance otherwise unencumbered in the treasury to the credit of the fund from which payment is to be made, each sufficient to meet the obligation thereby incurred, and unless such contract or order bear the certificate of the Director of Finance so stating; . . . All contracts and purchases shall be awarded to the lowest and the best bidder after due opportunity for competition in accordance with this charter and the ordinances of the city; but, unless otherwise provided by ordinance, it shall not be necessary to advertise for bids in any newspaper in case of contracts and purchases involving an expenditure of less than $2,500. . . . ''

Section 80, Art. 4, of the City Charter, provides: ''Division of Purchases and Supplies: There shall be in the department of finance a division of purchases and supplies. The Commissioner of Purchases and Supplies shall make all purchases and contracts for purchases for the city in the manner provided by ordinance; provided, however, that in all cases there shall be opportunity for competition.

''Whenever the interests of the city will be thus promoted, he shall purchase goods, supplies and material at wholesale or in bulk and the same shall be paid for out of any funds appropriated in this department for that purpose.'' This section also provides that supplies may be supplied out of the general stores of the Division of Purchases and Supplies.

It will be noted that the Statute and the City Charter provisions purport to prohibit the City from contracting for labor and materials except by written contract. However, plaintiff's theory of recovery, as disclosed in his petition, is that the labor and materials were obtained by the City in connection with emergency work done on various buildings and installations. The City suggests (but apparently does not insist) that the statute and the charter provisions make no exceptions in cases of emergencies, and even if the labor and materials were furnished in response to emergencies, plaintiff cannot recover. There is authority to support the assertion that it is to be presumed that it was not the intention of the law makers to prohibit the City from having work done when a proper emergency arises, allowing no time to comply with such preliminaries as competitive bidding, a written contract, or the like. [2 Dillon on Municipal Corps., sec. 802; Menzies v. Harlem Loan Ass'n., 62 N. Y. S. 726.] However, it is unnecessary for us to pass upon that question for the reason that after examining the record we find there is no evidence that any of the contested items were furnished in response to an emergncy.

''An emergency is . . . 'any event or occasional combination of circumstances which calls for immediate action or remedy; pressing necessity; exigency; a sudden or unexpected happening; an unforeseen occurrence or condition.' '' [Glass v. Board of Common Council of City of Frankfort et al. (Ky.), 90 S. W. (2d) 700, 703.] ''Emer-

gency is defined as, 'An event or occasional combination of circumstances calling for immediate action, pressing necessity, a sudden or unexpected happening, exigency,' Citing cases. The word 'emergency' is defined in Cent. Dict. as follows: 'A sudden or unexpected happening; an unforeseen occurrence or condition; specifically, a perplexing contingency or complication of circumstances. A sudden or unexpected occasion for action; exigency; pressing necessity.' Citing cases. 'The word "emergency" signifies some sudden or unexpected necessity, requiring immediate or at least quick action.'" [Bigham v. Lee County (Miss.), 185 So. 818, 820; see, also, McQuillin on Municipal Corps., sec. 1295.] "The word (emergency) signifies some sudden or unexpected necessity requiring immediate, or, at least, quick action". [Mallon v. Water Commissioners, 144 Mo. App. 104, 110.]

In connection with the labor and materials furnished and sued for there was no written contract, no competition bidding, and no certificate of the Director of Finance that funds were available. However, it is admitted by the parties that the question of competitive bidding and a certificate of available funds are not involved in this case and that the sole question is whether there was sufficient emergency to justify the omission of a written contract in each instance.

Most of the labor and materials furnished by the deceased (hereinafter referred to as the plaintiff), were in connection with the repairing of old buildings, such as the old City Hall and the equipment therein, at a time when the City Government was being moved from the old City Hall to the new one. After the City Government had had moved the City began to dismantle the old City Hall but there still remained in it Police Headquarters, a police court, a jail, a holdover, a press room, and some elevator service and electric lighting were being maintained. Steam to generate the electricity and to operate these services came from three old boilers. The City was trying to keep this service alive until the new Police Headquarters, Police Court, and Radio Station building, then under construction, were finished. There was a City Market across the alley from the old City Hall, which was being maintained, the lights therefor being from electricity generated in the old City Hall building. The City Market contained food stuffs in great quantities and a comfort station was maintained in connection with the market. The old City Market was being torn down while a new one was being constructed at the same place. All of these old properties were at one place, and the heat, and power for electricity used in connection therewith were generated in the old steam boilers in the old City Hall.

Plaintiff was his only witness as to the labor and materials furnished. There is very little testimony relative to under what circumstances they were furnished; plaintiff's testimony being confined, largely, to the fact that they were furnished on the order of the Com-

missioner of Purchases and Supplies, what they consisted of, what work was done, and the reasonable value thereof, whether the work that was done could be said to come under the heading of "emergency" is left largely to the character of the work itself rather than to the circumstances under which it was ordered done, in each instance. There is a dearth of evidence as to whether any of the work was done as the result of a "sudden or unexpected happening", or, an "unforeseen occurrence or condition."

The City insists that there was no emergency in connection with the doing of the work covered by plaintiff's exhibit No. 1. This work was in connection with repairing hydrants on the roof of the new City Hall, which had been broken by frost. The water had been turned off all winter (1939) and when it was turned on (about April 1939) it flowed down the roof in large quantities. This work was done on April 24, and who turned on the water is not directly shown but it was turned off by plaintiff's employees and, thereafter, the hydrants were dismantled and repaired by plaintiff. In plaintiff's brief it is stated that these hydrants were on top of the new City Hall, a skyscraper, for fire protection. As far as preventing any damage from the flow of water is concerned the mere turning off of the water took care of that situation. There is no evidence as to why these hydrants were maintained upon the building. But if they were there to be used in case of fire there is no evidence that the emergency was such as to not afford a reasonable time to enter into a written contract for the doing of the work. There is no evidence as to how long it would take to enter into a written contract for the doing of this and the other work involved in this case but, apparently, such a contract could have been executed in a short time. It could not be said that the repair of all the equipment owned by the City that might be used in connection with fire fighting would come under the heading of an "emergency", as that term is defined. These hydrants had apparently been out of repair for sometime and, therefore, their repair was not the result of a "sudden or unexpected happening", etc.

Plaintiff's exhibit No. 2 covers a bill for repairing two pumps for two large ornamental fountains south of the new City Hall. The machinist employed by the City was unable to find the trouble. A large volume of water was used and to save expense the same water was used over and this was made posible by the use of pumps. When plaintiff was called in he found that sand was coming through the pumps cutting the "glands and disks out of the pumps". When plaintiff arrived the water was shut off, the pumps were taken down, and plaintiff made the necessary repairs. The record is barren of any evidence tending to show any emergency in connection with the doing of this work.

Plaintiff's exhibit No. 3 covers services in making a water connection with a coffee urn in the police building. The urn was used in the

feeding of prisoners and "They use coffee sometimes when they want to sober some of these fellows up and they give them that hot black coffee when they come in there with that bum whiskey they are crazy". There is nothing in the record to indicate any emergency in connection with this work.

Plaintiff's exhibit No. 4 covers services in connection with welding some stools in the City Carpenter Shop. There is nothing in the record indicating any emergency in connection with this work.

Plaintiff's exhibit No. 8 is a bill for repair work at the old City Hall. The work consisted of "shutting down the water lines, draining steam boiler and line, repacking closet tank in basement, faucets at sink, checking oil burner, draining system lines, pumps, other piping and tanks, clearing garage drain in the yard".

There were three boilers at the old City Hall, two of which were sufficient to operate the equipment in the winter and summer. The City held one boiler in reserve. "One boiler has to go cold. They had three boilers there and when one was down they kept one in good repair so that they could keep things going". It thus appears that repairs could be made to a boiler by shutting it down, which would not interfere with the operation of the facilities being maintained for the City Hall and Market building. It would appear that there was no emergency in connection with the repairing of a boiler, under such circumstances, as there were two being used while the third one was being repaired. While this bill seems to cover some items, other than repairs to the boilers, there was no effort made to separate the charges for the various items of work done and it is impossible to tell how much of the bill covers the repairs on the boilers and what was charged for the work covered by the other items. Exhibit No. 8 cannot be allowed on the theory that it covers emergency work.

Plaintiff's exhibit No. 10 was a bill covering repairs on the Country Club Police Station, and Station No. One, or Police Headquarters, in the old City Hall. The bill for this work shows that it consisted, in part, in disconnecting a large unit heater and delivering it to the Street Cleaning Department. This was done because the City was trying to salvage as much as it could "of the equipment at the old City Hall." This bill also covers work done on the "steam line and radiators on account of Police moving No. 1 Station"; work on radiator valves, installing toilet seat in No. 2 Police Garage, installing sink in boiler room, cleaning coil in hot water heater, repairing "frozen and broken pipe at car wash rack, running drain on wash rack", and various other work in connection with radiators, plumbing, etc., at the various police stations.

It would appear that there was nothing in the nature of an emergency existing in connection with removing the large unit heater, or repairing the water pipes at the car wash rack. In fact, there is no

evidence indicating that any of the work done was of an emergency nature.

Plaintiff's exhibit No. 13. This bill includes an item for repairing one of the boilers in question. The bill also covers work done in connection with repairing a broken water line, which apparently furnished water to the City Market. There might possibly be some kind of an emergency in connection with the repairing of a broken water line furnishing water to a building used for necessary city activities. However, the bill is for a lump sum of $156.75 for the whole work done. It is impossible to tell what was charged for repairing the water line and what for repairing the boiler.

Plaintiff's exhibit No. 14 covers work done at Police Headquarters and Police District stations. Generally summarized this bill is for work done at the Police Garage, repairing and repacking flushmeter, work in Womens Holdover at No. 1 Station, overhauling boiler, moving radiators and checking heating system, cleaning out steam pipes, cleaning out steam traps on unit heaters, oiling motors and adjusting fan blades, capping up steam lines.

Plaintiff testified that the general purpose of the work was to keep these old buildings "alive". As far as the evidence shows nearly all of the work that was done was merely general repair work. There is no evidence indicating any emergency in connection therewith and, like in the other exhibits, one charge was made for all the work. No effort was made to separate the charges for the various things done.

The boilers at the old City Hall were fired by oil. Plaintiff's exhibit No. 17 covers work done on oil burners. They were old and dirty. One had to be overhauled and cleaned. A steam trap in the fuel tank was installed, the oil line was cleaned, repairs were made to "Chuse" Engine, clearing sewer in back of boilers, repairing leak in hot water line, other repairs, and installations of similar character. It appears that the work represented by this bill was for general repairs and upkeep, at least, there is no evidence of an emergency.

Plaintiff's exhibit No. 18 covers various repairs and replacements at Police Headquarters in the old City Hall, and district police stations. In includes clearing radiators in telephone and Press rooms and the Detective Department, clearing radiator in Police Chief's Office, replacing broken brass nipple in car washer in Police Garage, No. 1 Station, cleaning drinking fountain in the Detective Department, cleaning out and repairing steam trap on water coils at No. 1 Garage, repairing leak in water line in wash rack. The bill also contains a long list of other and similar items. There is nothing in the record indicating any emergency in connection with the doing of this work.

Plaintiff's exhibit No. 23 covers work done at the old City Hall building consisting of overhauling lines and valves on No. 2 boiler, repairs to Chuse generator and hot water plate in the engine room, cleaning steam trap on hot water heater in engine room, repairing auto-

matic draft regulator No. 3 boiler, overhauling oil burner No. 1 boiler, repairing broken steam line to burner, overhauling oil burner on No. 2 boiler, repairing Reaves engine, clearing sewers in Boiler and Engine rooms, and similar work. There is nothing in the record indicating that any of this work was done as the result of an emergency arising.

In connection with plaintiff's exhibit No. 24, plaintiff testified: "That is another one of them monthly bills on plumbing work at the police stations. It states the work we have done at the police stations. It states the work we have done at headquarters and the district stations. . . . Well, it was just repairs requested, repair stuff"; that the Police Headquarters work consisted of . "Q. What did you do over there? A. Well, general repair work, repaired water cooler in the chief's office on the second floor, also repaired water cooler at police garage, cleared toilet in the women's holdover. They had a women's holdover down there in the basement, you know, and they would stop them sewers. up, one thing and another, and affect the plumbing."

Clearing the toilet might possibly be classified as emergency work; but no effort is made to separate the items covered by the bill, or, as to the charges mentioned therein. It cannot be allowed on the theory that it covers emergency work.

Plaintiff's exhibit No. 35 covers work done at the Tuberculosis Hospital and, for the most part, is for the repairing of water leaks. "The water was running down the wall, and there was a damp place in the wall and we had to hustle around and find that leak in there and we did find it and repaired it. . . . It was a cement wall and it kept the wall all wet. Q. Well, there was no flooding or anything like that, was there A. No, but there were places on this floor, wet all the time".

Plaintiff says that this was emergency work because the floor was constantly wet and the building was inhabited by tubercular people; that premises where tubercular people live must be kept dry and sanitary. There is no evidence that the condition of the place, in any way, affected the patients, or, was likely to do so. We fail to see any emergency in connection with this work requiring it to be done before a written contract could have been entered into.

Plaintiff's exhibit No. 37 covers work done at one of the City Hospitals "repairing shower pan, repacking shower valve, relining shower at internes quarters . . . $28.60, . . . connecting gas plate in basement of orderlies' quarters . . . $5.35." These items for $28.60 and $5.35 were allowed. We are unable to agree that connecting a gas plate was emergency work, at least, in the absence of any further explanation. There is no evidence of any emergency in connection with the repairing of the leaking shower pan.

Plaintiff's exhibit No. 42 covers work done at the old City Hall, "mostly keeping them boilers in repair". There is nothing in the record to indicate that this work was done as the result of any emergency arising.

Plaintiff's exhibit No. 43 covers work done at Police Headquarters and at various district stations. It contains a great number of items, including work on the police court toilet, repairs to drinking fountain, repairing hot water heaters, overruling "overhead swivel hose", removing toilet bowl. "They got something stuck in it", cleaning various closets and urinals, cleaning out coolers, packing faucets and ball cocks in men's holdover. Some of these items might possibly come under the heading of emergency if more fully explained. It would appear that prisoners threw things into the toilets stopping them up. Clearing the toilets, under such circumstances, might require quick action. However, in this bill, like the others, no effort is made to make a separate charge for the various items. A lump charge is made for the labor and materials furnished. There certainly is no evidence tending to show that each and every item of the work done was performed as a result of an emergency.

Plaitniff's exhibit No. 49 covers work done in the Fire Alarm Building on Hospital Hill. It consisted of "Repairing heating plant, repairing leak on return line, installing air vent on end of steam, renewing hand hold gaskets on boiler, rehanging return line in battery room and cleaning and reseating all radiator steam traps. Labor $90". The order for this work was given by the head of the Fire Department. Plaintiff testified that "It is marked emergency". The requisition or order may have shown such a marking but the exhibit does not. The order is not in evidence. It is admitted by the parties that the fact that the head of the Fire Department considered the repairs as emergency work, if he did, is not binding upon the court. There is nothing in the record to indicate any emergency in connection with it. The work was done in the latter part of March, which would be the latter part of the heating season. Evidently, the condition had existed for sometime.

The City makes no point as to any other bills except those that we have reviewed. We conclude that there is not sufficient evidence in the record to justify the allowance of any of these bills on the ground that the work was done as the result of an emergency. There is no evidence that there was not time for plaintiff to enter into a written contract with the City for the doing of the work wihout resulting in serious harm to any one.

Plaintiff's contention that no written contract was necessary under Section 80 of the City Charter because the bills come under the head of purchases rather than contract for purchases is not well taken. The statute and charter provisions make no distinction between pur-

chases and contracts for purchases. The statute uses the word "contracts".

It is also insisted by the plaintiff that the City is contending that the purchases made by the plaintiff were *ultra vires* and, as defendant did not affirmatively plead *ultra vires* as a defense, such defense is not available. However, the petition proceeded on the theory that the work was done as the result of emergencies arising. Plaintiff was thereby seeking to exempt himself from the letter of the statute and the charter provisions. The answer was a general denial. Assuming that this is a character of *ultra vires*, that must be pleaded as a defense in order for it to be raised, plaintiff, in his petition, having anticipated the defense, is not now in position to insist that it was not pleaded by defendant. [State ex rel. v. Gromer, 252 S. W. 705; Hughes v. Carson, 90 Mo. 399; Terrenbach v. Fehlig, 74 S. W. (2d) 503.]

Plaintiff insists that the court erred in failing to allow certain items sued for and, in this connection, calls our attention to exhibit No. 20. This exhibit covers largely work done in connection with the removal of two toilets and lavatories from the old City Hall building to the City Market. People at the City Market used a comfort station that was located "just outside of the City Hall, . . . just south of the City Hall." In the course of the tearing down of the old City Hall this comfort station was removed, so it was necessary that such facilities be established in connection with the market. A part of the City Market had been torn down and, in this work, apparently other toilet facilities were removed and there was none there when the work in question was done. However, it appears that, even when the work was done, there was still a comfort station in the part of the City Hall building remaining, which was being used. It does not appear that there was any great emergency in moving the two in question. There is no evidence that the condition present meets the requirement of a "sudden or unexpected happening".

Plaintiff's exhibit No. 26 covers work done on a heating plant at Fire Station No. 5. It was not working satisfactorily. The work was done in April 1939. Plaintiff testified: "They went through the winter and along in the spring they thought they had better have them fixed up". The head of the Fire Department made the requisition. Printed at the head of the requisition is the notation "Emergency Order". The work consisted of moving "the unit 20 feet south and lowered it four feet, that is to give it drainage, changed the unit to face east, moved center unit away from post and lowered same to face west, moved east unit south and lowered same. Face off center about 15 degrees". The trouble with this heating plant could not be classified as a "sudden or unexpected happening". Apparently the plant had been in poor condition all winter. The people in the building had been able to remain there with the aid of a heating stove.

There is no indication that there was lack of time for the City to enter into a written contract for the doing of the work.

Plaintiff's exhibit No. 31 covers work consisting of repairing a broken water pipe in the floor of the diet kitchen in one of the hospitals, running gas line to connect a gas plate in the diet kitchen, installing urinal in the internes quarters, installing sink in store room at the tuberculosis hospital, hanging lavatory connecting waste and water to same at the hospital, installing waste and water lines and connecting sterilizer, and hanging lavatory at General Hospital No. 2. There is nothing in the record to indicate that any of this work resulted from an emergency arising. As to the urinal, plaintiff testified: "They had the urinal there all ready and they just wanted me to hook it up. They were internes out at the General Hospital and they wanted to have everything more convenient, and this . . . and they wanted this extra urinal in, and I put one in that they had there and I hooked it up".

Plaintiff's exhibit No. 33 covers work done on the heating system at one of the fire stations. Plaintiff testified: "We revamped the system, changed the pipes and one thing and another. They had all the material on this job and they didn't know how to do it". He further testified that the work was done to increase the "steam pressure"; that the plant worked better after he had completed the work than it did before; that the firemen said "it was the first time the place had been warm all winter"; that this work was done on April 10th "at the close of the winter". This work was not done as a result of a "sudden and unexpected happening". There is nothing in connection with the work indicating that there was not time to enter into a written contract to cover it.

Plaintiff's exhibit No. 38 covers work done at General Hospital No. One in the "isolation kitchen, connecting gas hot plate, installing temporary waste line to ice box, . . . work done at . . . morgue", consisting of "removing all plumbing fixtures from old Mental Ward, removing basin from check room, . . . work done at General Hospital No. 2, repairing shower valve in Internes' Quarters". There is nothing in the record to indicate that any of the work done in connection with this bill was the result of an emergency.

Plaintiff's exhibit No. 39 covers a number of items for which there was a general charge. Part of the bill is for changing the operating table in the General Hospital Morgue from a wooden to a chromium table. This table was used by the Coroner in performing post mortems. It was "something they were using down there hour by hour", and the changes had to be made so that the work would not be interrupted. There is nothing in the record to indicate that the table was changed as the result of an emergency arising.

Plaintiff's exhibit No. 52, is a charge for work done at General Hospital No. 2, consisting of "disconnecting bath tub and breaking wall,

breaking out old shower floor, breaking into walls to disconnect old shower fixture and rearranging water pipes for tub connections, breaking floor in bath room receiving ward, changing waste line so tub could be connected to pot trap''. Plaintiff testified that the City Hospital authorities were changing the bath room shower to a tub, ''changing the room around, changing these baths in the colored hospital''. There is nothing in the record to indicate that there was any emergency about this.

Plaintiff's exhibit No. 54 is a bill covering work done at No. 30 Fire Station, consisting of ''revamping the heating plant in order to increase the efficiency of the same''. The work was very much like that done on the heating plant at Fire Station No. 12 in connection with plaintiff's exhibit No. 33. There is no evidence of any emergency in connection with this work.

The court properly disallowed the items mentioned in plaintiff's assignment of errors.

From what we have said the judgment should be reversed and the cause remanded, with directions to the trial court to enter judgment in favor of plaintiff in the sum of $1207-03, which covers the items allowed by the court and not now contested by defendant.

All concur.