Enoch R. NEEDLES, Ruben N. Bergendoff, Ellis E. Paul, Theodore J. Cambern, Josef Sorkin, James P. Exum, Elmer K. Timby, and Carl L. Erb, partners, doing business as Howard, Needles, Tammen & Bergendoff, Appellants,

v.

KANSAS CITY, Missouri, a municipal corporation, Respondent.

No. 49336.

Supreme Court of Missouri,

Division No. 2.

Sept. 9, 1963.

Motion for Rehearing on Count One or to Transfer to Court En Banc Denied Oct. 14, 1963.

Clyde J. Linde, Billy S. Sparks, Kansas City (Linde, Thomson, VanDyke, Fairchild & Langworthy, Kansas City, of counsel), for appellants.

Keith Wilson, Jr., City Counselor, Herbert C. Hoffman, Associate City Counselor, Ned B. Bahr, Asst. City Counselor, Kansas City, for respondent.

BOHLING, Commissioner.

Plaintiffs Enoch R. Needles, Ruben N. Bergendoff, Ellis E. Paul, Theodore J. Cambern, Josef Sorkin, James P. Exum, Elmer K. Timby and Carl L. Erb are partners engaged in business as consulting engineers under the name of Howard, Needles, Tammen & Bergendoff with fully staffed offices in Kansas City, Missouri, New York, New York, and elsewhere. The firm originated in Kansas City and has specialized in major bridges, turnpikes and interstate highway systems. The plaintiffs, herein referred to as "Engineers," sued the City of Kansas City, Missouri, in three counts. They sought a judgment in Count I for a balance of $106,938.59, with interest, on a claimed fee of $654,761.34 for professional services to the City in connection with what is known as the "Broadway Bridge" project in the vicinity of the Kansas City Municipal Airport. Counts II and III of the Engineers' petition are alternative counts, each seeking the recovery of $110,005.00 out-of-pocket expenses incurred

by the Engineers in performing additional work required of them in connection with additional plans adopted during the construction of the Broadway Bridge project for expanding said facilities; Count II on the theory an emergency situation existed making the City liable and Count III on the theory that the said services fell within certain general clauses of an agreement of April 3, 1952.

The trial was to the court. The City admitted a balance of $29,753.26 was due the Engineers under Count I, and plaintiffs had judgment on said count for $29,753.26, with interest from April 2, 1957, of $8,211.85. The judgment, entered on general findings, was in favor of the City on the alternative Counts II and III. Following the overruling of their motion for new trial, plaintiffs appealed. Plaintiffs question the judgment on each count.

The issue under Count I involves the interpretation of the following portion of the contract provision (later quoted in full) covering the Engineers' compensation; to-wit: "a fee of Five and 8/10 Per Cent (5.8%) on the total principal amount on the bonds required to finance this project." The Engineers contend their 5.8% should be based on $11,288,988.66, an amount obtained after deducting, as provided in the contract, from a $13,000,000 bond issue the interest on the bonds during construction and the Engineers' compensation. The City bases the 5.8% on a lesser amount, $9,958,207.15, which we understand is claimed to be the actual construction costs of said project shown by the City records as of February 17, 1961.

Ordinance 15,368 of Kansas City, March 10, 1952, authorized the Mayor to contract with the Engineers for services in connection with the location, construction and financing of a new bridge across the Missouri River; and a contract between the City and the Engineers was entered into April 3, 1952, for what is known of record as the Broadway Bridge project, which was to be financed by $4,500,000, principal amount, revenue bonds of the City, payable solely out of toll revenues derived from said project. (Consult RSMo 1949, §§ 234.210–234.300, V.A.M.S.) This contract provided for "a fee of six per cent (6%) on the total principal amount on the bonds required to finance this project" to the Engineers. It was a "package deal" contract and embraced unusual features in that the Engineers were to furnish, among others, financial and legal services in addition to engineering services of designing and supervising the construction work.

Further investigation and study resulted in enlarging the project for much greater user by the public. This involved, among other things, the acquisition of additional land and easements for the construction of said project and all appurtenances incident to such construction, including, for instance, increasing the traffic lanes of said bridge from three to four lanes, and the proposed revenue bonds from $4,500,000 to $13,000,000. The Engineers so recommended to the City in a Feasibility Report dated March 29, 1954, revised June 1, 1954.

Stifel, Nicolaus & Company, investment bankers of Chicago, Illinois, were the financial advisers on this project. The Feasibility Report submitted by the Engineers was prepared after consultations with the financial advisers, particularly with respect to the contingent fund stated therein.

This Feasibility Report (approved in Ordinance 18,107, July 23, 1954) carried the Engineers' estimated costs of the project, which was copied in the Prospectus for the sale of the $13,000,000 Broadway Bridge Revenue Bonds. Said estimate of the costs read: "Construction cost of the Main River Bridge between Fifth and Broadway and the Airport Terminal Plaza $7,250,000. Airport Plaza, Richards Road and Extension with Connection to U. S. 71 $2,000,000. Toll Facilities and Equipment $200,000. *Total Construction Cost $9,450,000.* Utility Relocation $150,000. Right of Way $245,000. Engineering, Fiscal Agent and Testing $650,000. Administra-

tion and Financing, including Bond Discount $300,000. Interest During Construction $1,137,500. Allowance for Contingencies $1,067,500. *Total Bond Issue $13,000,000.*" (Emphasis supplied.)

The record indicates the City objected to the 6% Engineers' fee of the original contract on the enlarged project, and the Engineers reduced it to 5% (see "Engineering * * * $650,000" item of Feasibility Report). The City also objected to the fee being based on the item for Engineers' fees and the interest during construction. Negotiations resulted in an agreement upon a fee of 5.8% "on the total principal amount on the bonds required to finance this project," after deducting the interest paid on the bonds during construction and the Engineers' fee.

Ordinance 18,107, July 23, 1954, as above indicated, approved the Engineers' general plan for said project and authorized the issuance of $13,000,000, principal amount, of "Broadway Bridge Revenue Bonds," estimated to be necessary therefor.

Ordinance 18,167, August 13, 1954, authorized the execution of a "Supplemental Agreement" between the City and the Engineers amending certain provisions of their agreement of April 3, 1952. It was executed by the parties August 24, 1954.

Later, February 25, 1955, Ordinance 18,746 directed the establishment of specified allocations of the Broadway Bridge Construction Fund, including, among others, the following: "Architectural and Engineering Services $655,000"; and "Contingencies $1,218,245."

The Broadway Bridge Revenue Bonds, authorized July 23, 1954, by Ordinance 18,107, § 2, were sold October 7, 1954. Actual construction of the project started November 11, 1954. The bridge, substantially completed, was opened to traffic September 5, 1956, and a certificate of completion was issued November 14, 1957.

By February or March, 1955, contracts had been awarded or bids had been received for all major construction connected with the original project under the Supplemental Agreement and other matters had so progressed that the final costs could be generally established. This disclosed that funds were available from the sale of the bonds for additional construction, the actual costs having been less than the Engineers' estimated costs. For instance, on Contract No. 1: "Three River Piers," "Original Estimate, June 1954, $1,513,000.00." "Gross Contract Amount $932,300.00." "Final Contract Amount $821,527.98." "Contingent Item in Contract $100,000." The Engineers had testimony $81,250 was saved on interest during construction because the project was finished in less than the estimated time. These differences between the Engineers' estimate and the actual costs amounted to $1,718,207.03. Said amounts were put in the contingent fund as they occurred, and the $1,067,500.00 contingent fund shown in the 1954 Feasibility Report reached $2,769,152.78, we understand, about January, 1957. The Engineers term this difference "savings." The City terms it "overestimates," carelessly and negligently made by the Engineers. There was testimony from R. N. Bergendoff (one of plaintiff Engineers and their principal witness who went into some detail respecting the costs of materials and the bids received) and James L. Jeffers (a vice-president of Stifel, Nicolaus & Co., investment bankers of Chicago, Illinois) that the low bids received on this project were the result of a drop in the price of steel and the fact that the contractors engaged in this type of construction were looking for jobs at that time. We find no contrary testimony of record.

The City also questions the $1,067,500 allowance for contingencies made by the Engineers in their official estimate of the costs. The evidence established that this estimate was made after consultation with the financial advisers. Mr. Jeffers and Mr. Bergendoff gave testimony to the effect that investors want ample funds on hand to complete a project of this nature, one financed by revenue bonds and not revenue produc-

ing until completed; that an allowance for contingencies in the estimated costs of the project is absolutely necessary for marketing the bonds and financing it, and the contingent item is generally 10 to 15% of the issue, but sometimes is higher. The allowance for contingencies on the Broadway Bridge project was approximately 11.2% on estimated construction costs of $9,450,000. We are directed to no testimony that a contingent fund of 10 to 15% would be improper.

At a meeting on February 18, 1955, between five administrative officers of the City and four representatives of the Engineers the enlargement of the improvements north of the Missouri River was discussed. The Engineers drew detailed plans and specifications for this additional work. Out of the $1,718,207.03 "savings" or "overestimates," $1,676,959.00 was expended for this additional construction for public user in connection with the Broadway Bridge project. The City takes the position these funds were used on the Broadway Bridge project and states its computation of the 5.8% for the fees and expenses of the Engineers includes this $1,676,959.00. This is the work for which the Engineers now seek reimbursement of their out-of-pocket expenses in alternative Counts II and III, hereinafter discussed.

It is not disputed that as of February 15, 1961, $1,001,272.78 of the proceeds from the sale of the bonds had been used to redeem outstanding bonds; and the City states $216,189.02 was on hand after the completion of the expanded project. An Engineers' exhibit places the "Unused Project Funds" at $1,103,042.76 as of December 17, 1958.

I. That portion of the paragraph of the Supplemental Agreement involved in Count I reads:

"The City agrees to pay and the Engineers to accept *in full payment for their services and expenses* performed after this agreement becomes binding upon the City for the payment of money, a fee of Five and 8/10 Per Cent (5.8%) on *the total principal amount on the bonds required to finance this project,* except that said fee shall not be payable upon the amount payable to the Engineers for their comprehensive services, nor upon the portion of such bond issue represented by interest during construction." (Emphasis supplied.)

The "comprehensive services" embraced, as hereinbefore indicated, financial and legal as well as engineering services.

The Engineers claim that under the above-quoted portion of the "Supplemental Agreement" they are entitled to a fee of 5.8% of $11,288,988.66, or $654,761.34. They place the interest on the bonds during construction at $1,056,250.00, which is admitted to be correct in the City's answer, and their fee, as stated, at $654,761.34, a total of $1,711,011.34. Subtracting said $1,711,011.34 from the total authorized bond issue of $13,000,000.00, the Engineers arrive at the above $11,288,988.66 figure for calculating their 5.8% fee for comprehensive services and expenses. They sue for a balance due of $106,938.59, the City having paid $547,822.75.

The City bases the Engineers' fee of 5.8% on $9,958,207.15, which, after excluding interest on the bonds during construction and the Engineers' fee, is stated to be the actual expenditures on the project shown on the City's records as of February 17, 1961. This calculation places the Engineers' fee at $577,576.01. Having paid $547,822.75 on the fee, the City admits a balance of $29,753.26 remained due.

The parties agree that the language involved is unambiguous. The fact that the parties do not now agree upon the proper construction of their contract does not make it ambiguous. Mickelberry's Food Products Co. v. Haeussermann, Mo., 247 S.W.2d 731[6]; Prentice v. Rowe, Mo. App., 324 S.W.2d 457[14]. Accordingly, we are to give effect to the expressed in-

tention of the parties. Hahn v. Forest Hills Construction Co., Mo.App., 334 S.W. 2d 383, 385[1]. The emphasized words were copied from the Original into the Supplemental Agreement, both agreements having been prepared by the Engineers.

The parties say "total" was used in the sense of all, the whole, entire. Glaze v. Hart, 225 Mo.App. 1205, 36 S.W.2d 684, 688 [9]; Webster's Third New International Dictionary. The City says "principal" as used means main, chief, the highest where there are several elements, citing 72 C.J.S. Principal, pp. 502, 503. The word has various meanings, e. g.: "2: a matter or thing of primary importance: a main or most important element: as a (1): a capital sum placed at interest, due as a debt, or used as a fund". Webster, supra. As used, "principal amount" appears to be synonymous with "principal sum," which has been held to mean: "The main sum—the amount originally paid for, and invested in, something." 49 C.J. 1349, nn. 23, 24. Consult Simmons Hardware Co. v. City of St. Louis, Mo., 192 S.W. 394[8]. Thus, "the total principal amount on the bonds" refers to the par or face amount of the bonds; that is, $13,000,000; which amount is immediately subject to the limiting phrase "required to finance this project." The City says the most harmonious meaning of the use of the word "require" in the contract is "need," stressing Moran Bolt & Nut Mfg. Co. v. Caldwell, 240 Mo. 358, 366, 144 S.W. 472, 474, 475, which quotes the following from Brewster v. Brewster, 52 N.H. 52, 58: " 'The verb "require" is not absolutely the synonym of the verb "need," though it is of the verb "demand." Crabb's Synonyms, 228. Although the verb *"require"* may, undoubtedly, be properly used in the sense of the verb *"need,"* such is not its primary nor its usual signification. * * * It means * * * to *"demand,"* or, as Webster defines it, "to ask as of right and by authority." ' " "Required" is the past tense of the verb "require," which, among other things, means: "3a: to call for as suitable or appropriate in a particular case: need for

some end or purpose * * * b: to demand as necessary or essential * * * c: to demand as a necessary help or aid: need as an essential: stand in urgent need of: need, want * * *." Webster, supra. See 77 C.J.S. Require, p. 271. "Finance" is here used as a verb, and is considered to mean, among other things, "to provide capital for." 36A C.J.S. pp. 410, 411. "To finance" means "1: to raise or provide funds or capital for * * * a new venture 2: to provide with necessary funds in order to achieve a desired end * * *." Webster, supra. "To finance" a corporation "means simply to loan it money" (Hobgood v. Ehlen, 141 N.C. 344, 53 S.E. 857, 861) or to loan the company money as needed to carry on the business (State v. Walla Walla Fruit Growers, Inc., 140 Wash. 94, 98 [2], 248 P. 54, 55, 56; Fred G. Clark Co. v. E. C. Warner Co., 188 Minn. 277, 247 N.W. 225[3], 230). The Engineers' case of Reese v. Walker, Ohio Mun., 151 N.E.2d 605, 608, considered the words "necessary financing" to mean more than the face amount of a loan and to include the interest rate, repayment rate and other terms. It was there pointed out that the parties must act in good faith and honestly in their dealings with each other.

"Business contracts must be construed with business sense as they naturally would be understood by intelligent men of affairs and in the same sense as is uniformly attached to them by the business world." Contracts, 12 Am.Jur. § 231, p. 754, § 226. 17A C.J.S. Contracts § 294, p. 23. "It is to be presumed that the parties contracted with reference to fair, reasonable, and practical results, and the language employed by them should have a fair, reasonable, and practical construction." Arnot v. Alexander, 44 Mo. 25, 29, 100 Am. Dec. 252; Tureman v. Altman, 361 Mo. 1220, 239 S.W.2d 304[6], 26 A.L.R.2d 729. Consult Worthington Drainage Dist. v. Elm Twp., 339 Mo. 270, 96 S.W.2d 374[1]; Liberty Storage Co. v. Kansas City Term. Warehouse Co., Mo.App., 340 S.W.2d 189, 192[4, 5].

An engineers' estimate of the costs of construction work is contemplated to be a reasonable approximation of the costs. City of Boonville v. Rogers, 125 Mo.App. 142, 101 S.W. 1120[2]; City of Boonville ex rel. Cosgrove v. Stephens, 238 Mo. 339, 141 S.W. 1111[8].

We conclude "required to finance this project" was used in the sense of whatever was reasonably and in good faith "needed," "wanted," or "called for" to finance the project.

The result might differ had the clause involved read "the total principal amount on the bonds issued to finance this project."

The City points out that it may not pay public funds for services or expenditures on its behalf without a prior duly approved written contract.

Section 432.070, RSMo 1959 and 1949, provided: "No * * * city * * * shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless * * * such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto * * *." Consult Mo. Const. 1945, Art. III, § 39, ¶¶ (3) and (4), V.A.M.S.

Kansas City Charter provisions, Article IV, are to the following effect:

Section 82 provides that no contract purporting to impose any financial obligation shall be binding upon the city "unless it be in writing and unless there is a balance, otherwise unencumbered, to the credit of the appropriation to which the same is to be charged sufficient to meet the obligation thereby incurred, and unless such contract * * * bear the certificate of the director of finance so stating * * *."

Section 95 provides that all contracts or obligations made contrary to the provisions of Article IV are void; and, further, "nor shall any act or omission on the part of * * * any officer or employee * * *, contrary to the provisions of this article, waive or qualify the limitations fixed by this article, or impose upon the city any liability whatever in excess thereof."

The provisions of § 432.070 have been considered mandatory, and not merely directory. Burger v. City of Springfield, Mo., 323 S.W.2d 777[1]. We think the following from Kansas City v. Rathford, 353 Mo. 1130, 186 S.W.2d 570, 574 [5–8], applicable:

"No contractual obligation is incurred by a Missouri city in the absence of the writing prescribed. * * * The contract, absent the prescribed writing, is *void*. The fact a municipality has received the benefit of a performance by the other party does not make the municipality liable either on the theory of a ratification, estoppel or implied contract." See authorities there cited.

Contractors are charged with notice of the restrictions imposed on the power of officials to contract on behalf of a municipality; and acts of municipal officials beyond the scope of their authority do not bind the city. Fleshner v. Kansas City, 348 Mo. 978, 156 S.W.2d 706, 707; Cook & Son v. City of Cameron, 144 Mo. App. 137, 144, 128 S.W. 269[2], 270; Fulton v. City of Lockwood, Mo., 269 S.W.2d 1[17, 18]

II. According to the Engineers' evidence "savings," termed "overestimates" by the City, of $1,718,207.03 were effected and $1,676,959.00 was expended for additional construction north of the Missouri River. The Engineers performed services of design and supervision on said construction; and, as stated, seek reimbursement of their out-of-pocket expenses of $110,005.00 in connection therewith in Counts II and III on the alternative theories (a) in Count II of the existence of an emergency and (b) in Count III that said services fall within certain general clauses of the Original

Agreement of April 3, 1952, remaining in effect. No authorities are cited by the Engineers in support of their position under Counts II and III. There was no ordinance or written contract with the City authorizing the reimbursement of these out-of-pocket expenses to the Engineers.

A meeting was held on February 18, 1955, between the City Manager; Directors of Public Works and Aviation; Traffic Engineer; City Engineer, and Chief Engineer, City Plan Commission, with four representatives of the Engineers for enlarging the improvements north of the Missouri River for public user. A letter of February 19, 1955, by plaintiff Bergendoff outlined for record the decisions for additional work proposed by the Engineers at said meeting. The Engineers drew and filed with the Director of Public Works detailed plans and specifications for this additional work, embracing work at the Airport Plaza, the dualization of the road leading north from the bridge, an interchange with U. S. Highway 71, and other improvements. A four page letter of March 23, 1956, from plaintiff Bergendoff brought a reply from the City Manager on March 30, 1956, stating: "The Council has authorized the enlargement of the project to include this additional work" provided written approval of the bondholders be obtained. The approval of the bondholders was not obtained until about June 20, 1956.

■ (a) Whether the emergency services began "immediately after the February 18, 1955, meeting," as the Engineers say in one place, or later, we are unable to sustain this payment to the Engineers on the ground of an emergency situation justifying the omisssion of a written contract otherwise required. Gray v. Kansas City, 239 Mo.App. 675, 194 S.W.2d 207[3], 209, defining "emergency"; Donovan v. Kansas City, 352 Mo. 430, 175 S.W.2d 874[15], 179 S.W.2d 108.

■ (b) The Engineers here stress the emphasized portions of the following from the concluding covenant of the Agreement of April 3, 1952, not "amended" by the Supplemental Agreement of August 24, 1954:

"It is also understood that *all other costs of the entire completed project not included under this agreement, including* rights of way, material, labor, all construction operations, contractual services of testing bureaus and of *persons engaged for special services,* substructure, superstructure, approaches, bridge office and accounting equipment, toll booths, and everything complete ready to begin operation as a toll bridge *shall be paid for solely from the Bond Fund.*"

As hereinabove stated, the Engineers agreed "to accept in full payment for their services and expenses," performed after the agreement became binding upon the City, "a fee of Five and 8/10 Per Cent (5.8%) on the total principal amount on the bonds required to finance this project," subject, however, to certain stated deductions. The services performed by the Engineers on this additional work and the expenses incurred in connection therewith were of the same nature as the services and expenses connected with the project as originally planned. The City's position is that it is paying 5.8% of the costs of this $1,676,959.00 under the Supplemental Agreement upon paying the $29,753.26 admittedly due the Engineers under Count I. The Agreements of April 3, 1952, and August 24, 1954, when read together are to the effect that the expenses of the Engineers were to be met by the Engineers and the City was not obligated to reimburse them therefor. The Engineers' presentation does not establish that the portion of the agreement stressed by them imposed a legal obligation on the City to reimburse them for these out-of-pocket expenses. Consult the provisions of the Kansas City Charter, § 82, quoted supra.

■ Appellate courts review court-tried cases upon both the law and the evidence as in suits of an equitable nature.

Civil Rule 73.01(d), V.A.M.R. However, we have been unable to determine with satisfaction to ourselves the amount the Engineers should receive in reason and good faith for their services and expenses under the Supplemental Agreement on the record before us. It may be, for instance, that some or all of the $1,001,272.78 used to redeem outstanding bonds and any additional surplus of the bond fund on hand after the completion of the Broadway Bridge project was not reasonably and in good faith required to finance the project. Civil Rule 83.13(c) provides: "Unless justice requires otherwise, the court shall dispose finally of the case on appeal and no new trial shall be ordered as to issues in which no error appears." The Engineers' fee for "services and expenses" is to be calculated on the total principal amount of the bonds reasonably and in good faith "required to finance this project." We are of the opinion and so rule that bond discount, excluded on the City's exhibit in the amount of $187,330.00, was part of the amount required to finance the project; that under the evidence in this record a contingent fund of approximately 11.2 or 11.4% is properly allowable against construction costs, and, in accord with the position of the City, that the amount required to construct the additional features north of the Missouri River should be taken into consideration.

The judgment entered on Count I is reversed and said Count is remanded for further proceedings in conformity hereto. The judgments entered on Count II and Count III are affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

All of the Judges concur.

ON RESPONDENT'S MOTION FOR REHEARING ON COUNT ONE OR, IN THE ALTERNATIVE, TO TRANSFER TO THE COURT EN BANC.

PER CURIAM.

The City, respondent, has filed a motion for rehearing on Count I or, in the alternative, to transfer to the Court en Banc.

The principal complaint in the City's motion is that the testimony of appellants, the Engineers, witnesses Bergendoff and Jeffers on, for instance, an allowance for contingencies as a proper item for consideration in arriving at "the total principal amount on the bonds required to finance this project" was not believed by the trial court and that said court cannot be convicted of error in so holding.

The City's presentation on original submission based the Engineers' compensation on the actual costs of construction, $9,958,-207.15; whereas the Engineers based their compensation on $11,288,988.66; that is, the $13,000,000 principal amount of the bonds less interest during construction and the Engineers' compensation. The City claims the Engineers' estimate of $13,000,000 for the costs of the project was a careless and negligent "overestimate". The City tacitly concedes, as we read its motion for rehearing, that a reasonable allowance for contingencies and, also, for bond discount is proper in arriving at the total principal amount of bonds "required to finance this project." It may be that the Engineers overestimated the costs of the project. The record before us is to the effect their 5.8% compensation should be based on an amount between the City's $9,958,207.15 costs of construction and the Engineers' $11,288,-988.66 figure, which includes allowances for contingencies and other items but, as stated, deducts interest during construction and the Engineers' compensation from the $13,000,000 principal amount.

As indicated, the judgment on Count I was reversed and said Count was remand-

ed for a new trial. The figures set forth in the opinion are based upon the record made on this appeal and are not to be taken as controlling upon a new trial. See Feinstein v. McGuire, Mo., 312 S.W.2d 20, 24[2, 3]; Laughlin v. Boatmen's National Bank, 354 Mo. 467, 189 S.W.2d 974, 977 [4, 5, 7].

The City's motion for rehearing or, in the alternative, to transfer to Court en Banc is overruled.