[1] This is an appeal from a judgment in favor of the defendant, George Frame, upon the second count of plaintiff's petition, in which plaintiff asked for damages in the sum of $1,500, $500 actual damages and $1,000 punitive damages.
[2] The action was filed in the Circuit Court of Greene County, Missouri, Division No. 1, on the 8th day of May, 1947, against George Frame and the General Council of the Assemblies of God, a corporation, defendants. At the end of plaintiff's testimony, the court sustained a motion to dismiss as to defendant, The General Council of the Assemblies of God, and the trial proceeded on the second count of plaintiff's petition against defendant, George Frame, resulting in a judgment for defendant, George Frame, from which judgment plaintiff appeals to this court.
[3] The second count of plaintiff's petition alleges that she purchased an unimproved lot in the City of Springfield, Missouri, from the defendant, George Frame, on the 10th day of May, 1946, for $1,250; that she paid him $500 in cash and received a *Page 383 
memorandum, in writing, signed by the defendant, in which he agreed to convey to her the lot in question, being 65 feet wide and 450 feet long, which lot had definite boundaries.
[4] The petition states that after plaintiff purchased said lot from the defendant, as aforesaid, he sold the north 155 feet of said lot to the General Council of the Assemblies of God for the sum of $750, which sale was made without her knowledge or consent; that defendant represented to plaintiff that he was mistaken in the depth of said lot when she purchased the same and that, in fact, it was only 305 feet in length; that plaintiff lived in California and carried on her transactions with defendant by mail and that she accepted a deed from the defendant for a lot 65 feet in width and 305 feet in depth, thinking it was the same lot she had purchased; that defendant George Frame represented to plaintiff that the only difference between the lot deeded to her and the lot actually contracted for was 12 or 15 feet, which had been dedicated for street purposes from the north side of her lot and offered and did deduct $250 from the purchase price thereon because of said shortage; that plaintiff paid $1,000 for the lot thus deeded to her.
[5] The petition alleges that thereafter plaintiff learned and ascertained that on or about the 2nd day of July, 1946, long after her contract of sale with defendant, George Frame, he sold and conveyed by warranty deed to the defendant, The General Council of the Assemblies of God, the north 155 feet of the land which the defendant, George Frame, had contracted and agreed to sell to this plaintiff.
[6] The petition alleges that the sale by the defendant of 155 feet off the lot purchased by her was a deliberate violation of the contract existing between them; that defendant received a far greater consideration for said 155 feet off the lot purchased by her than the $250 deducted by the defendant from the purchase price of the lot purchased by plaintiff.
[7] Plaintiff states that she has been damaged by said breach of contract in the sum of $500; that the actions of defendant, in selling said part of her lot, were wilful and malicious and done with deliberate purpose of injuring, defrauding and interfering with plaintiff's enjoyment of the property purchased by her from defendant and prays for $1,000 punitive damages.
[8] On the 13th of March, 1948, the court rendered judgment in favor of the defendant, George Frame, and in said judgment stated that the allegations in plaintiff's petition are not sustained by the evidence and dismissed plaintiff's cause of action.
[9] Appellant raises but one question in her assignments of error and that is, "The court erred in finding the plaintiff estopped by an accord and satisfaction, because an accord and satisfaction or a compromise procured by false and fraudulent misrepresentations is invalid."
[10] In this opinion we will refer to appellant as plaintiff and to the respondent, George Frame, as defendant.
[11] We, here, state such facts as are necessary for the proper determination of the issue in the case.
[12] The defendant, George Frame, was the owner of lots 1 and 6 of Hobart's Kenwood Addition to the City of Springfield, Missouri. Lot 1 adjoins lot 6 on the north, and each lot is 629 1/2 feet east and west, by 305 feet north and south. Together, the two lots comprise a tract almost square, being 610 feet north and south and 629 1/2 feet east and west.
[13] The plaintiff was a resident of California during all the events in dispute. She was visiting in Springfield in April, 1946, and, at that time, was shown a tract of land fronting on the southeast corner of lot 6 by the defendant. This lot was 65 feet east and west by 450 feet north and south. Defendant had previously sold a lot 65 feet wide and 150 feet deep off the north and east side of lot 1 to one Lee Hart, and this left approximately 450 feet on the east side of the large tract comprising both lots. The north boundary of the lot sold by the defendant to plaintiff was well defined by the location of Mr. Hart's garage and back fence.
[14] The plaintiff and the defendant walked over the lot and looked at it and saw the *Page 384 
north boundary but there was no survey or measurements made. Defendant represented to plaintiff that the lot was 450 feet long and 65 feet wide and the agreed purchase price was $1,250. Plaintiff made a down payment of $500. This cash payment was made by plaintiff, through her sister, on May 10, 1946. Defendant gave plaintiff's sister a written receipt, signed by himself, reciting he had received $500 as down payment, "on a lot 65 feet west on Kenwood and about 450 feet north and south, the balance due $750.00."
[15] About May 20, 1946, the officers of the General Council of the Assemblies of God offered defendant $13,000 for all of lot 1, except the Lee Hart tract and another small tract which had been deeded away by defendant. This offer also was contingent upon the opening of a 40 foot street between lots 1 and 6, 20 feet to come off of lot 1, and 20 feet off of lot 6. On May 20, 1946, defendant entered into a written contract to sell the General Council this land and to dedicate the land for the street. This land contracted to be sold and dedicated as aforesaid took in the north 170 feet of the property defendant had contracted to sell plaintiff. Defendant testified that on May 20, 1946, the date of the contract to the General Council, he knew that plaintiff's down payment covered part of the land he was selling, but he didn't remember. He testified that he knew about the mixup at the time he wrote plaintiff, May 30, 1946.
[16] May 30, 1946, defendant wrote plaintiff a letter in which he made the following statement:
"Yours recent date. The receipt for the $500.00 was given as directed by Mrs. Lawson.
"The piece of property is not as long as I thought it was but the price remains the same but if you do not care to go any further I will return your down payment when you have your sister return the receipt given her. In case you care to clear the deal it will be necessary for you to advise me what you can pay — say Semi Annually although it was my impression that it was a cash deal when we first talked however I can carry you at 6% interest which I am told is customary in deals of this nature.
 "Very Respt. "G. H. Frame.
"P.S. The size of lot is will be 65 x 310 with an additional 17 feet for ___ I cannot give you a deed, as the street is that much to the south but I do not believe it will ever be changed being there over 20 years etc.
"GHF."
[17] July 2, 1946, defendant deeded to the General Council the north 150 feet of the lot he had contracted to sell plaintiff. The defendant never informed the plaintiff that he had sold any part of her lot.
[18] On June 29, 1946, defendant wrote plaintiff a letter in which he stated,
"* * * your recent letter. You are indefinite about how you want to pay balance on Lot so I suggest that I made out the papers for you to sign making the balance $750.00 to be paid Jan. 1 — 1947 — if this is satisfactory please advise and I will mail them to you immediately as I told you before the size of the lot will be 305' 5" north and south 65 ft. east and west that I will deed you with an additional 10 to 15 feet which is under fence but I do not have title to but which lays in the street I do not think it will ever be changed or could be as it has been that way for the last 20 years that I know of. You will join the CBI on the north and your east line will join Tuck and Allison on the east and your west line will join me.
"Now Mrs. Paasche, lets settle this at once for I have missed several sales already wish to know your position.
 "Very Respt. "G. H. Frame."
[19] On August 3, 1946, defendant again wrote plaintiff as follows:
"I sent you some papers to be signed returned which have not been recd by me or the Citizens Bank to date.
"I believe there has enough time elapsed to have this deal closed please return the papers properly executed or the receipt for *Page 385 
to 500.00 you have paid and it will be returned to you.
"I am refusing too many sales of this lot and wish to sell it to some one else.
 "Yours Respt. "G. H. Frame."
[20] Plaintiff testified that she received the letters from the defendant as are herein set out. Her testimony is as follows:
[21] "Q. Then, in answer to that last letter in which Mr. Frame asked the sale be completed, what did you do then? Did you come back to Springfield, Missouri? A. Yes, sir. — No, sir.
[22] "Q. Did you complete the transaction for the sale? A. I got — turned it over to Mr. Haymes, Mr. Lon Haymes, an attorney here.
[23] "Q. You turned it over to Mr. Lon Haymes. A. Yes, sir.
[24] "Q. And did you receive a deed to the property? A. Not until it was paid off."
[25] Plaintiff testified that she received a deed to the property from defendant, September 5, 1946, at her home in California; that she was to pay the balance of the purchase price in six months; that she gave $1,000 for the property.
[26] Plaintiff testified as follows:
[27] "Q. Now, how did the purchase price get reduced from $1250.00 to $1,000.00? A. Well, Mr. Frame knocked off $250.00 for the property. He said that he took it off, which I thought was just for the street.
[28] "Q. What information did you have, Mrs. Paasche, as to what property had been taken off and why the purchase price was reduced? A. Well, he said he had sold off some of the property.
[29] "Q. For what purpose? A. To the Bible School.
[30] "Q. When did he tell you that? A. That was in one of the letters.
[31] "Q. When you closed this deal on September 5, 1946, at that time the purchase price was reduced $250.00, was it not? A. Yes, sir.
[32] "Q. Now, at that time, Mrs. Paasche, you had corresponded with Mr. Haymes, and Mr. Haymes was representing you, and you understood that the lot was only 305 feet instead of 450. Is that right? A. Yes, sir.
[33] "Q. How much did you understand was off of the land that you had actually looked at out there? A. Twenty feet for a street.
[34] "Q. Twenty feet for a street. A. That was for the school.
[35] "Q. Where was that on your property? Where were you told that was on your property? A. At the north end.
[36] "Q. Now, in September when you closed this transaction, had you been informed about any other property being sold off? A. No, sir."
[37] Plaintiff testified that she understood that the only part of the property she purchased from the defendant that defendant was not conveying to her in the deed she received was twenty feet for a street off the north side of her property which she thought defendant had sold to the Bible School. She testified that her only knowledge as to how deep the lot was she purchased was just her looking at it; that she had never had a survey made to determine the size of the lot.
[38] Plaintiff testified that she merely asked defendant to show her the property and the part that he was taking off for a street. She testified that she closed the deal with the defendant, executed her note and deed of trust for the balance of the purchase price before she learned that defendant had sold 150 feet off the north side of said lot.
[39] Plaintiff gave the following testimony:
[40] "Q. In regard to that conversation in February, 1947, when you returned to Springfield, Missouri, just tell the Court what your conversation was with Mr. Frame at that time? A. Well, he told me that he done wrong by selling off the lot to the school, after he had already sold it to me, but he said — he walked up, and — he said, `I tell you what I will do. I will give you a strip off the side of the south and north, and I think it will make up for that.' And we talked about it several days about it."
[41] The plaintiff testified that at all times she thought the street was to be taken off the *Page 386 
north end of her property which adjoined the house on the north end and the garage and that the letters she wrote to Reverend Williams were about this street.
[42] Senator Haymes, an attorney of Springfield, Missouri, of the firm of Haymes and Dickey, testified that he was employed by plaintiff and represented her in the controversy over the sale of the land in question. He testified that he notified the defendant of his employment and that the defendant came to his office to see him about the matter. He gave this testimony:
[43] "Q. Just relate the conversation, as you remember it, and if Mr. Frame didn't come over to your office and tell you that originally the agreement was that he was to sell Mrs. Paasche a strip of ground out north of the town by the Central Bible Institute, a strip of ground 65 by 450 feet north and south, 65 feet east and west and 450 feet north and south, but that by an oversight, or a mistake, on his part that he had deeded part of this land to the Central Bible Institute out there and that he couldn't deed her the full amount of the land of which this receipt called for. Do you remember Mr. Frame telling you that, or words to that effect? A. Well, that is about it. When he came in, I don't know whether he had some copy of the contract or whether Mrs. Paasche had sent me the memorandum, or whatever it is. I don't recall.
[44] "Q. Look and see. A. I don't know. But Edith, as we call her, sent it to me, or maybe her sister brought it up. I don't know. Anyhow, he said he could not sell the land involved in that purported description. And I asked him, `Why' and he said that he had sold it off to — I don't know who the grantee was — but it was connected with the Central Bible Institute out here. That was the impression I got.
[45] "Q. But he said he had sold it off, and he said he couldn't do that. A. Couldn't convey it. And I said, Well, of course, that is really something, when you have contracted to sell something and you can't deliver.' Well, he said, `I can't.' And he said, `That is just the way it is; I can't do it.'"
[46] Mr. Haymes testified that he informed the defendant that plaintiff had a suit against him or a claim and that he would have to adjust the matter in some way. He testified that defendant offered to deliver a deed to a lot 65 by 305 feet. He testified that his client sent him a mortgage or deed of trust prepared by the defendant because he had informed plaintiff that the mortgage was not in due form. There was some difference in the description of the land and the mortgage that was now proposed. He testified that he told the defendant that it would be up to him and the plaintiff as to what they were going to do. He testified that he told the defendant that plaintiff insisted upon the land in her original agreement and that he stated he could not transfer it and that the defendant would have to make some adjustment with her. Then he testified that the defendant stated he would take $250 off the purchase price and the witness testified that he told the defendant that he would have to notify plaintiff of this proposition, that he would put it up to the plaintiff. The witness gave the following testimony:
[47] "The Reporter: (Reading) `And Mr. Haymes, did you write Mrs. Paasche about it and submit the proposition of taking off $250.00?'
[48] "The Witness: Yes, I apparently wrote her, and then we had some telephone conversations. I think there were several telephone conversations about it — or two."
[49] The witness testified that he wrote plaintiff a letter, dated September 5, 1946, and that he enclosed a deed, to the property in question, which was not signed by the defendant. The witness did not remember whether he prepared the deed or whether it was prepared in the office of defendant's attorney. The letter was identified by the witness and is as follows:
[50] "`Dear Mrs. Paasche: I have your letter of August 26 on the Frame' — another matter not related to this — (Reading) `I have talked with Mr. Frame a number of times, and with his attorney, and I believe we have the lot business worked out. Yesterday, Frame came to my office *Page 387 
and I told him we are going to have to adjust this lot price, or do something, as he had sold off part of the land. He said he realized he had made a mistake. I told him he should knock off on the purchase price, and he said he realized he should. He finally agreed to knock off $250.00, so the balance is only $500.00. He has sold off part of the property you are to get, so that he has only 305 feet left North and South.
[51] "`The deed of trust sent us —' Now, I don't know if this has anything to do with it or not. — `(Reading) The deed of trust he sent is not correct, and I told him to have his lawyer redraw it and to draw a warranty deed.
[52] "`Enclosed is a note and deed of trust for $500.00 for signatures of yourself and husband. Both of you should sign the note, and you should go before a notary public and sign the deed of trust. Be careful that the notary public fills in the date and blanks. If you send it back incomplete, it will just have to be returned.
[53] "`Enclosed is the warranty deed Mr. and Mrs. Frame will make to you. It, as you will see, is made to you, alone, and if you want it that way, when you return it I will have it signed. Don't you and your husband sign it. If you want the property in your husband's name, so tell, and I will change the warranty deed when you return it. I talked with Mrs. Lawson last night, and she thinks you should go ahead and purchase the property, since $250.00 has been knocked off.' * * *.
[54] "`Frame will deliver the warranty deed and will send it to you, or turn it over to your sister, Mrs. Lawson, to record, if you say so. Because of the extended trouble and time and the services rendered, our fee is $50.00. We have not had time to examine the abstract but we believe it shows that Frame has owned the property for over twenty years and suppose the title is all right. You can send us the $50.00 fee and return the note and deed of trust properly signed, and the warranty deed, and we will complete the purchase, that is, if you don't want to settle on this other matter. But if you want to settle, return only the warranty deed and the settlement, or release, and we will complete the purchase as stated. You consider the matter carefully and do as you please.
[55] "`We are sending this letter by air mail and ask your air mail response and the papers. Be specific in what you want done so we will not have to write or wire back for further information, if it can be avoided.' * * *."
[56] Mr. Haymes testified that plaintiff returned the deed and deed of trust to him; that she executed the deed of trust and that the defendant executed the deed in accordance with the understanding between himself and the plaintiff.
[57] The witness testified that plaintiff did not tell him not to close the deal; that he talked to plaintiff's sister, Mrs. Lawson, and that she urged her sister to take the lot with the reduction in price. Mr. Haymes said that he just submitted the compromise agreement to plaintiff take it or leave it and told her to think it over carefully and send the papers back if she wanted to accept defendant's offer and if she didn't she would just have a lawsuit.
[58] The witness, Haymes, testified that he received a letter from plaintiff in which she told him that she was enclosing the deed of trust, signed by herself and husband, also the note; that plaintiff stated in the letter that she was going to try to get back the twenty feet.
[59] Plaintiff's testimony definitely states that she thought, at all times, that the $250 reduction in price made by defendant was made for the twenty feet off the north end of the lot for road purposes and, at no time, did she know about the 150 feet being sold off.
[60] Under the new Code the appellate court reviews the case upon both the law and evidence as in suits of an equitable nature where the cause is heard before the court without a jury. This rule is very forcibly set out in A. A. Electric Machinery Co. v. Block, Mo.App., 193 S.W.2d 631, 635, as follows: "`The appellate court shall review the case upon both the law and the evidence as in suits of an equitable nature. The judgment shall not be set *Page 388 
aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' Laws 1943, p. 388, Mo. R.S.A. § 847.114(d). Consequently, this proceeding is to be reviewed by us as are suits in equity. In such suits we arrive at our own conclusions as to the law and the evidence, and the findings of the trial court are not binding upon us, although they should be given due deference." Rone's Estate v. Rone, Mo.App., 218 S.W.2d 138, 139; Gray v. Kansas City, Mo., 239 Mo.App. 675, 194 S.W.2d 207.
[61] The sole question presented on this appeal is whether the plaintiff's action in accepting the deed to the smaller lot, and accepting the reduced purchase price, amounted to a compromise and settlement of plaintiff's cause of action for breach of contract.
[62] It is the contention of the plaintiff that she accepted the offer of the defendant to reduce the purchase price of the lot in question by $250 under a complete misapprehension of the true facts and that this mistake of fact was caused by the deliberate and wilful fraud of the defendant. To support plaintiff's contention, she cites 15 C.J.S., Compromise Settlement, § 35, p. 753, which states the law thus: "An agreement of compromise, as is the case with other contracts, is invalid and subject to impeachment if procured by fraud or by false and fraudulent representations. It is obvious that there can be no fraud where the agreement is entered into with knowledge of the facts. * * *."
[63] In 1 C.J.S., Accord and Satisfaction, § 44, p. 546, plaintiff relies upon the following law as therein set out: "* * * Also, an accord and satisfaction may be avoided, rescinded, or set aside for fraud in inducing or procuring it, unless the settlement was made with full knowledge of the fraud or the subject-matter of the misrepresentation was as much within the knowledge or means of knowledge of one party as the other. * * *."
[64] In Hettrick Mfg. Co. v. Service Clothing Co., Mo.App. 293 S.W. 466, 468, the court states the law thus: "The law is well established that an accord and satisfaction entered into and executed through a mutual mistake of fact is not binding. * * *." This case also holds that where an accord and satisfaction is procured by fraud the settlement is void.
[65] In Shearer et al. v. Hill, 125 Mo.App. 375, 102 S.W. 673, the court held that in an action for fraud that the complainant must have relied upon a false representation; otherwise there is no deception or imposition.
[66] We agree with the law as declared in the authorities cited by plaintiff and we agree with plaintiff's contention that if plaintiff accepted the deed to the lot in question from the defendant for the reduced price under a complete misapprehension of the true facts and that this mistake of fact was caused by the deliberate and wilful fraud of the defendant then plaintiff should be allowed to recover in this case and the cause should be reversed.
[67] A careful examination of the evidence does not sustain plaintiff's contention. We find that defendant, on the 10th day of May, 1946, entered into a contract with plaintiff to sell her a lot in Springfield, Missouri, 65 feet east and west and 450 feet north and south, for $1,250 and received a cash payment of $500 for which he gave his written receipt describing the lot therein and signed the same; that, at the time of the sale of said lot, plaintiff viewed it and was well acquainted with its boundaries; that on the 2nd day of July, 1946, defendant sold and conveyed, by warranty deed, to the General Council of the Assemblies of God, 150 feet off of the north end of the lot sold plaintiff with an additional 20 feet off for road purposes. We find that defendant owned other lots adjoining the lot sold to plaintiff and that, in order to make the sale of these lots to the General Council of the Assemblies of God, he had to include the north 150 feet and the additional 20 feet for road purposes off of plaintiff's lot and that by doing so he received $13,000 for all of the property. The facts indicate that the part received for the 150 feet off of plaintiff's lot was approximately $750. We find that *Page 389 
this was a breach of defendant's contract with plaintiff.
[68] The facts further disclose that plaintiff lived in the state of California and had no knowledge of defendant's acts in selling a part of the lot sold to her.
[69] May 30, 1946, defendant wrote plaintiff a letter in which he told her that he had received the payment of $500 on the lot and had given his receipt as directed by Mrs. Lawson, her sister. In this letter defendant informed plaintiff that the property was not as long as he thought it was but that the price remained the same. He told plaintiff in this letter that if she did not desire to go further with the purchase he would return to her the down payment if she would have her sister return the receipt. He also informed plaintiff in this letter that the size of the lot would be 65 x 310 with an additional 17 feet in the street, which he could not deed to her but expressed the view that this part would never be changed because it had not been used for twenty years.
[70] On June 29, 1946, defendant wrote plaintiff a letter regarding the balance due on the lot and again informed plaintiff that the size of the lot would be 305' 5" north and south and 65 feet east and west with an additional 10 or 15 feet which is under fence but which defendant did not have title to, which part he informed her was in the street. In this letter defendant makes his first reference to the General Council of the Assemblies of God. He made this statement, "You will join the CBI on the north and your east line will join Tuck and Allison on the east and your west line will join me."
[71] Again, he wrote plaintiff a letter on August 3rd, 1946, in which he discussed the sale of the property and urged that plaintiff execute the papers and complete the deal or else return his receipt and receive back her $500.
[72] Certainly, up to this time, defendant had not informed plaintiff that he had sold the 150 feet plus the 20 feet for a roadway off the north end of her land, but the statements in his letters to plaintiff were deceiving. If this were all of the testimony we would hold the defendant guilty of fraud.
[73] Plaintiff testified that the price of the property was reduced from $1,250 to $1,000 and that she thought the $250 was taken off of the purchase price for the street and, in answer to a question as to what information she had as to what property had been taken off by the defendant so as to reduce the purchase price, she gave this answer: "A. Well, he said he had sold off some of the property." And when the question was asked for what purpose, she answered, "To the Bible School"; and when asked when did the defendant tell her that, she answered, "That was in one of the letters."
[74] Now plaintiff testified that she had correspondence with Mr. Haymes and Mr. Haymes was representing her and that she understood that the lot was 305 feet instead of 450 feet. She stated she thought that the roadway 20 feet was what was deeded to the Bible School.
[75] Plaintiff testified that before she completed the purchase of the lot in question she employed Lon S. Haymes of the firm of Haymes and Dickey, in Springfield, Missouri, to represent her and that she knew at the time she accepted the deed from defendant and executed her deed of trust to the defendant for the balance of the purchase price on said lot that she was only getting a lot 65 feet east and west and 310 feet north and south and that the purchase price was reduced to $1,000.
[76] Now the evidence shows that Mr. Haymes, an attorney of the firm of Haymes and Dickey, was employed and did represent plaintiff in closing the transaction between the parties in this case; that Mr. Haymes notified defendant to come to his office and that defendant did go to his office and he told plaintiff's attorney that the reason he could not deed the lot 65 feet wide and 450 feet long was because he had sold a part of the lot to the Central Bible Institute. Mr. Haymes had a copy of the contract, between plaintiff and the defendant at the time, which called for a lot 65 x 450 feet. Mr. Haymes testified, "Well, of *Page 390 
course, she will naturally have a suit against you, or a claim, and we have got to adjust the thing some way." He said, "`Well, now, it will be up to you and her as to what you are going to do. She insists on her land.' And I said, `I can't transfer it.' I said, `Well, have you got any notion of any way out of it, you say you will have to make an adjustment with her.' And he said, `Well, I guess I would.' I said, `Yes. Have you got any notions I can put up to her?' And he said, `I will take off $250.00 off of the purchase price.' And I said, `Well, that is, of course, up to you. It's your money, and she is doing the buying. All I can do is tell her what you are willing to take off of the purchase price.' And he said, `Well, I will do that.' I said, `Well, I will put it up to Mrs. Paasche.'"
[77] In pursuance to this conversation with the defendant, Mr. Haymes wrote Mrs. Paasche.
[78] "* * * I have talked with Mr. Frame a number of times, and with his attorney, and I believe we have the lot business worked out. Yesterday, Frame came to my office and I told him we are going to have to adjust this lot price, or do something, as he had sold off part of the land. He said he realized he had made a mistake. I told him he should knock off on the purchase price, and he said he realized he should. He finally agreed to knock off $250.00, so the balance is only $500.00. He has sold off part of the property you are to get, so that he has only 305 feet left north and south. * * *.
[79] "Enclosed is a note and deed of trust for $500.00 for signatures of yourself and husband. Both of you should sign the note, and you should go before a notary public and sign the deed of trust. Be careful that the notary public fills in the date and blanks. If you send it back incomplete, it will just have to be returned.
[80] "Enclosed is the warranty deed Mr. and Mrs. Frame will make to you. It, as you will see, is made to you, alone, and if you want it that way, when you return it I will have it signed. Don't you and your husband sign it. If you want the property in your husband's name, so tell, and I will change the warranty deed when you return it. I talked with Mrs. Lawson last night, and she thinks you should go ahead and purchase the property, since $250.00 has been knocked off. * * *
[81] "You can send us the $50.00 fee and return the note and deed of trust properly signed, and the warranty deed, and we will complete the purchase, that is, if you don't want to settle on this other matter. But if you want to settle, return only the warranty deed and the settlement, or release, and we will complete the purchase as stated. You consider the matter carefully and do as you please."
[82] We hold that the defendant disclosed to Lon S. Haymes, plaintiff's attorney, the full facts concerning the disposition of the 150 feet off the north end of plaintiff's lot and the 20 feet for road purposes, which reduced the size of plaintiff's lot to a length of 305 feet and that Mr. Haymes, acting for and in behalf of plaintiff, negotiated a compromise settlement of the breach of said contract and submitted the settlement to plaintiff, who approved it by accepting the deed and by executing her note and deed of trust for $500 which was the balance of the purchase price after the reduction of $250 for the sale of the part of plaintiff's lot by the defendant.
[83] While plaintiff testified that she believed the settlement was only for twenty feet for road purposes, yet we cannot reach that conclusion from the evidence. Therefore, we find that there was a breach of contract and that plaintiff's claim for such breach was fully settled when she accepted $250 reduction in the price of the lot; that she, through her agent and attorney, was fully advised of all of the facts pertaining to such breach of contract before the settlement was made and that there was no fraud.
[84] Judgment affirmed.
[85] VANDEVENTER, P. J., and BLAIR, J., concur. *Page 391